# United States Court of Appeals
## For the First Circuit

No. 08-1116

UNITED STATES OF AMERICA,

Appellee,

v.

COSME SANCHEZ-RAMIREZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Farris,* and Howard, Circuit Judges.

Michael Tumposky, with whom Stephen B. Hrones and Hrones, Garrity & Hedges, were on brief, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

June 30, 2009

*Of the Ninth Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**.  Following a bench trial in which the district court rejected his insanity defense, appellant Cosme Sanchez-Ramirez ("Sanchez") was convicted of all three counts lodged against him:  being a felon in possession of a firearm,[1] making a false statement in the acquisition of a firearm,[2] and making a false claim of citizenship.[3]  He was sentenced to 180 months' imprisonment.  He posits two arguments on appeal.  First, Sanchez claims that the district court erred in not ordering a competency hearing after the close of evidence and before closing arguments, in addition to the one ordered immediately after his arraignment.  Second, he argues that the district court erroneously applied the minimum sentence mandated by the Armed Career Criminal Act ("ACCA") to him because certain prior burglary convictions in Florida were not "violent felonies" within the meaning of the ACCA.  Finding the district court's decision not to order a second competency hearing well within its discretion, and its sentencing decision virtually on all fours with recent Supreme Court precedent, we affirm.

## I.  Factual Background

We recite the facts relevant to this appeal in the light most favorable to the verdict.  United States v. Marin, 523 F.3d

---

[1]See 18 U.S.C. §§ 922(g)(1) and 924(e)(1).

[2]See 18 U.S.C. §§ 922(a)(6) and 924(a)(2).

[3]See 18 U.S.C. § 911.

24, 26 (1st Cir. 2008). Sanchez was born in Cuba, and arrived in the United States at age sixteen in 1980 as part of the Mariel boatlift. His application for asylum was denied, and a deportation order issued. Cuba, however, refused to accept Mariel returnees, the deportation order was never executed, and Sanchez remained in the United States.

In April 2005, Sanchez attempted to purchase a handgun from a pawn shop and licensed firearms dealer in Bangor, Maine. A store employee, Orlando Frati, testified that he provided Sanchez with some assistance in filling out the required federal firearms purchase application, including pointing out to Sanchez that he had not answered a question seeking his citizenship status. Sanchez responded by writing "Yes, USA" on the form. He further answered that he was not a convicted felon, and that he was a Native American or Alaskan Native. All three answers were false.

Sanchez examined two pistols while in the store. He did not purchase either of them, but mentioned that he preferred the smaller of the two because it was easier to conceal and thus avoid suspicion or be readily available for use in any confrontation with police. He also posed in front of a mirror with a gun in his pocket. Sanchez produced a social security card, but did not have the necessary photo identification to make a purchase. After promising to return with the proper identification, Sanchez left in the same taxi in which he had arrived. Frati had noted the license plate number of the taxi as was his habit with waiting cabs.

After Sanchez left, Frati submitted the completed application to the National Instant Check System. After a delay, the application was denied. Because he was concerned about the denial in combination with Sanchez's concealment and police comments, Frati provided authorities with Sanchez's application form and a video from the store's surveillance system containing footage of Frati's interaction with Sanchez in the store. Investigation by an agent of the Bangor Police Department and federal Bureau of Alcohol, Tobacco, Firearms and Explosives task force revealed that Sanchez had been convicted of, inter alia, four felonies -- three in Florida and one in Georgia. Using the taxi's license number as a lead to locate him, authorities arrested Sanchez soon after in a local motel.

At a detention hearing shortly after his arrest, Sanchez's defense counsel moved for a psychiatric examination and competency hearing. The district court granted the motion, and Sanchez was transferred to a federal medical facility for evaluation. Given its central role in this appeal, we first turn to the record evidence relating to Sanchez's mental health.[4]

## II.  Mental health history

Sanchez has a lengthy history of mental health problems, the details of which are not in dispute.[5] He testified that he

---

[4]Sanchez's personal and medical history is culled from reports in the record, as well as Sanchez's own testimony.

[5]In addition to his own history, Sanchez testified that members of his family also had a history of mental illness.

tried to injure himself on two separate occasions in Cuba before he was ten years old and that he occasionally hears voices speaking to him "from another world." Sanchez recounted being hospitalized in Cuba when he was thirteen for purposes of a judicially-ordered mental health examination. Sanchez said that he was forced to leave Cuba in the Mariel boatlift because his mental health made him an undesirable in the eyes of Fidel Castro.

Sanchez's difficulties continued after his arrival in the United States. In 1984, he was hospitalized in California after cutting his wrists. In 1993, he was hospitalized in New York, after behaving erratically and "feeling like dead people were following" him. In 1999, Sanchez was hospitalized in North Carolina after he was found wandering on a highway. The record also reflects two suicide attempts in Virginia and Georgia between 2000 and 2002 which resulted in hospitalizations.

Sanchez was living with a friend in Portland, Maine prior to arriving in Bangor. While there, he suffered from depression and hallucinations. Sanchez was also hospitalized after police responded to a call that he was in possession of a knife and was threatening suicide. He was again hospitalized during his time in Portland when it was reported to police that he was trying to light a fire in the kitchen of a shelter where he was staying. He ultimately relocated to Bangor.

On the day prior to his attempted gun purchase, Sanchez testified that he was planning on leaving Maine and taking a bus to Atlanta, Georgia in order to seek medical attention there. He had

been drinking before going to the bus station, where he met a man and a woman who convinced him that they could help him. Instead, the three spent time taking pills and drinking liquor, before the couple attempted to rob Sanchez. Although the robbery was unsuccessful, the couple left Sanchez on a Bangor street near the motel where he was eventually arrested.

Early the next morning, Sanchez took a taxi to a local hospital because he was not feeling well. He was denied treatment at the emergency room due to the smell of alcohol on his breath. Shortly thereafter, he began having a panic attack, which led to suicidal thoughts which prompted him to direct the cab driver to take him to a place to buy firearms.

## III.  Pre-trial proceedings

Pursuant to the district court's order, Sanchez was held at the Federal Medical Detention Center in Massachusetts for 45 days following his arraignment. During that time, licensed clinical psychologist Christine Scronce interviewed Sanchez for eight hours and conducted four hours of psychological testing in order to assess his competency to stand trial. She also collected Sanchez's medical history -- both from records and his own recollection -- and considered staff observations and evaluations. At the conclusion of her work, Dr. Scronce prepared a lengthy report and testified at a competency hearing before a Magistrate Judge. She concluded, among other things, that Sanchez exhibited "a general pattern of deceitful and manipulative behaviors," which

she described as "hallmark signs of malingering." In particular, she noted that Sanchez often reported symptoms "for secondary gain," such as being hospitalized rather than jailed, or being allowed to receive meals in private.

Regarding the pending criminal proceedings, Scronce found that Sanchez had a good relationship with his attorney, understood the charges against him and had the ability to consult with counsel to aid in his defense. Accordingly, Scronce concluded that Sanchez was competent to stand trial. The Magistrate Judge, in addition to accepting Scronce's conclusions, noted that Sanchez acted appropriately during courtroom proceedings, and ultimately found Sanchez competent to proceed. That ruling has not been appealed.

Approximately one year later, in June 2006, defense counsel moved for another pretrial evaluation on the grounds that Sanchez was unreasonable and uncooperative. The motion was denied without prejudice, but an accompanying motion to continue the trial was granted in order to allow time to obtain additional medical records and give defense counsel an opportunity to review Sanchez's mental health history more fully and determine whether and to what extent to place his mental state in issue at trial. Defense counsel did not renew the motion before trial.

**IV. Trial**

A bench trial began in January 2007, lasting approximately four trial days. The trial proceeded uneventfully. Because Sanchez was interposing an insanity defense and also

arguing that his mental health negated the required mens rea, the district court heard testimony from Dr. Scronce and from a defense expert. After the close of evidence, the parties submitted written trial briefs prior to scheduled final arguments in June. Three days prior to the scheduled arguments, defense counsel filed a third motion for a competency hearing. Counsel reported that Sanchez had stopped taking his prescribed medication and was having difficulty understanding the facts and issues relevant to his case. The court did not immediately rule on the motion. The trial court's post-trial Findings of Fact and Conclusions of Law describe what followed:

> When Mr. Ramirez arrived at the courthouse, he was beside himself. Prior to the arguments there was considerable banging in the holding cell near the courtroom and, at a conference of counsel, the United States Marshal expressed serious safety concerns, noting that Mr. Ramirez was virtually uncontrollable. As this was not a jury trial and no evidence was to be taken, the Court acceded to the Marshal's recommendation that he be shackled for the hearing.

> When the proceedings began, Mr. Ramirez engaged in a loud, continuous rant, a foul and abusive harangue against all present. After entering, the Court waited to see if Mr. Ramirez would calm down. He did not. In accordance with Illinois v. Allen, the Court asked Mr. Ramirez if he could behave himself and repeatedly warned him that it would have him removed from the courtroom, if he persisted. Mr. Ramirez continued unabated with his incoherent and profane screed and showed no signs of controlling himself. As Mr. Ramirez was incapable of remaining in the courtroom without disrupting the proceedings, the Court ordered him removed and the parties made their final presentations in his absence.

- 8 -

United States v. Ramirez, 495 F. Supp. 2d 92, 112 (D. Me. 2007) (internal citations and footnote omitted).

The trial court also noted that Sanchez's courtroom behavior was a reversal from his demeanor during the multiple days of trial, during which he sat quietly and testified "appropriately." Id. at 112 n. 24. In the end, the trial court found Sanchez guilty of the charges against him, rejected his insanity defense, and denied the third motion for a competency examination. Id. at 124 n. 33. It is this denial which Sanchez now appeals.

## V. Discussion

Due process requires that a defendant be mentally competent to be tried, convicted or sentenced. United States v. Gonzalez-Ramirez, 561 F.3d 22, 28 (1st Cir. 2009) (citing Drope v. Missouri, 420 U.S. 162, 172-73 (1975)). The district court must order a competency hearing "'if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature of the proceedings against him or to assist properly in his defense.'" Id. (quoting 18 U.S.C. § 4241(a)). We review for abuse of discretion the district court's decision not to hold a competency hearing, and will affirm the decision so long as there was a sufficient evidentiary basis to support the decision. Id. (citing United States v. Bruck, 152 F.3d 40, 46 (1st Cir. 1998)).

Here, as previously noted, Sanchez is not appealing the trial court's conclusion that he was competent to stand trial. Instead, he argues that his behavior after the close of evidence and prior to closing arguments -- at least partly fueled by his failure to continue taking prescribed medication -- required the district court to continue the proceedings and order another competency evaluation and hearing.

The record reflects several factors which support the court's decision. First, there is the fact that Sanchez was originally found competent to stand trial, a decision which was neither objected to nor appealed. It is true, as appellant argues, that that conclusion was reached in August 2005, nearly two years prior to the behavior at issue here. The record does not end there, however. The second factor weighing against appellant's position is that a report prepared in February 2006 by a defense expert, Dr. Martinez, concluded that Sanchez was competent to stand trial. Significantly, Sanchez mistakenly believed that Martinez's report would be kept confidential.[6] In addition to his finding of competence, Dr. Martinez also noted Sanchez's tendency to malinger and exaggerate his symptoms, and that his actions "indicate a significant degree of . . . planned, controlled, behavior . . . ." In August 2006, Dr. Martinez prepared a second report, which Sanchez understood would be disclosed. Here, Dr. Martinez stopped short of proclaiming Sanchez incompetent to stand trial, finding

---

[6]Sanchez's belief was based on inaccurate information provided by Dr. Martinez. Indeed, the defense did not even disclose the existence of Martinez's February report until mid-trial.

only that he suffered from alcohol-induced psychosis at the time he committed the crimes at issue. Also, as the trial court noted, medical personnel reported that Sanchez had, in the past, told others that reporting suicidal or homicidal ideations was a method of avoiding jail by getting hospitalized.

Another factor in support of the district court's ultimate conclusion is that the second motion for a competency hearing -- which was denied without prejudice in June 2006 -- was never renewed, suggesting that the issues which gave rise to the motion were temporary in nature.

Next, the district court had the opportunity to observe Sanchez at trial, during January 2007. The record, which included Sanchez's own testimony, is devoid of any indication that Sanchez was suffering from any psychological difficulties during the trial. See Cody v. United States, 249 F.3d 47, 53 n. 5 (1st Cir. 2001) (defendant's observable appearance, demeanor and performance in court supported district court's competency decision). And while Sanchez correctly points out that this time period pre-dates by approximately five months the time period at issue in this appeal, there is again further evidence in the record that undermines his claim. Sanchez was sentenced in January 2008, approximately six months after the closing arguments. As with his conduct at trial, the record reflects no signs of mental impairment during his sentencing proceedings. On the contrary, he asked appropriate questions, was coherent throughout his allocution, praised the

treatment he received at the Maine State Prison, and, according to his attorney, was able to assist in the sentencing process.

While Sanchez's mental health in January 2008 may not, standing alone, be an accurate gauge of his mental health in June 2007, the picture we are left with is one in which Sanchez's behavior on and around June 11, 2007, stands in stark contrast to his diagnoses and behavior on other occasions both before and after that time period.  In light of this record evidence, we conclude that the district court acted within its discretion in denying Sanchez's third motion for a competency hearing.


## VI. Sentencing

The lone sentencing issue before us is Sanchez's argument that the trial court erred in concluding that his three third-degree burglary convictions in Florida were violent felonies within the meaning of the ACCA.  We review de novo the legal conclusion as to whether a prior conviction qualifies as a "violent felony".  United States v. Brown, 510 F.3d 57, 73 (1st Cir. 2007).

The ACCA imposes a fifteen year mandatory minimum sentence on anyone convicted of violating 18 U.S.C. § 922(g) -- unlawful firearms possession -- who has three prior convictions for certain drug crimes or violent felonies.  18 U.S.C. § 924(e)(1).  A "violent felony" is defined as "any crime punishable by imprisonment for a term exceeding one year . . . that:

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

> (ii) is burglary, arson, or extortion, involves use of explosives or otherwise involves conduct that presents a serious potential of physical injury to another.

18 U.S.C. § 924(e)(2)(B).

As relevant to this appeal, Sanchez's somewhat lengthy criminal history included three convictions in Florida for burglary of churches in 1990 and 1994. During this time period, Florida defined burglary as "entering or remaining in a dwelling, structure, or conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain." Fla. Stat. § 810.02(1) (1994). A "structure" was further defined as a "building of any kind . . . together with the curtilage thereof." Id. § 810.011(1). Finally, the three convictions at issue were for third-degree burglary, defined as burglary of a structure where "there is not another person in the structure at the time the offender enters or remains . . ." and the offender does "not make an assault or battery and is not armed . . . with a dangerous weapon . . . ." Id. §§ 810.02(3), (4).

Where, as here, prior convictions do not fit the definition of "generic burglary," we employ a categorical approach to determine whether they fit within the ACCA's residual clause.[7]

_____

[7]The predicates at issue do not fit within clause (i) of the ACCA because they do not have the threat or use of physical force as an element. For the ACCA to apply under the enumerated "burglary" provision of clause (ii), Sanchez's convictions would have to be for so-called "generic" burglary, defined as "the unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." Taylor, 495 U.S. at 599. Because Florida's burglary statute includes curtilage within

- 13 -

Specifically, the issue is whether they "otherwise involve conduct that presents a serious potential of physical injury to another." United States v. Pratt, ___ F.3d ___, No. 05-2624, 2009 WL 1532961 at *5 (1st Cir. June 3, 2009); see also United States v. Pakala, ___ F.3d ___, No. 07-2092, 2009 WL 1636345 at *5 (1st Cir. June 12, 2009).

In determining whether these convictions are encompassed by the ACCA, we begin by "examin[ing] [them] in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." Begay v. United States, 128 S. Ct. 1581, 1584 (2008) (citing Taylor v. United States, 495 U.S. 575, 602 (1990)). In addition we must examine whether the putative predicate in question is "roughly similar, in kind as well as in degree of risk posed" to the ACCA's enumerated crimes -- burglary, arson, extortion, or those using explosives. Id. at 1585.

As we noted in Pakala, much of our work in determining whether a third-degree burglary conviction in Florida fits within the ACCA has already been done by the Supreme Court in James. See Pakala, ___ F.3d at ___, 2009 WL 1636345 at *6. In James the ACCA predicate conviction at issue was for attempted burglary under the same Florida statute, and the issue before the Court was whether that conviction was covered by the residual clause of §

its reach, and because the documents permissibly reviewed under Shepard v. United States, 544 U.S. 13, 15-16 (2005), do not exclude the possibility that Sanchez was convicted of "non-generic" burglary, we look only to the residual clause. James v. United States, 550 U.S. 192, 212 (2007).

- 14 -

924(e)(2)(B). After first holding that an "attempt" under Florida law is within the contours of the residual clause -- an issue not before us -- the Court noted that Florida law has narrowly defined "curtilage" as including only "an enclosed area surrounding a structure." James, 550 U.S. at 213 (quoting United States v. Matthews, 466 F.3d 1271, 1274 (11th Cir. 2006)). Thus, the inclusion of curtilage in the definition does not lessen "the risk presented by attempted burglary so as to take the offense outside the scope of clause (ii)'s residual provision." Id. On the contrary, curtilage adjacent to a structure is typically enclosed "to keep out unwanted visitors -- especially those with criminal motives. And a burglar who illegally attempts to enter the enclosed area surrounding a dwelling creates much the same risk of physical confrontation . . . as does one who attempts to enter the dwelling itself." Id. Thus, the Court concluded that since attempting to enter the curtilage "requires both physical proximity to the structure and an overt act directed toward breaching the enclosure," attempted burglary "'presents a serious potential risk that violence will ensue and someone will be injured.'" Id. (quoting Matthews, 466 F.3d at 1275 (burglary of the curtilage in violation of Florida law is a violent felony under the ACCA)); cf. Chambers v. United States, 129 S. Ct. 687 (2009) (Illinois conviction for failing to report for weekend confinement falls outside of ACCA residual clause because it lacks serious potential for risk of physical injury).

Sanchez seeks to escape the reach of James on the ground that James involved attempted burglary of a dwelling,[8] while Sanchez's convictions all involved unoccupied churches, i.e., non-residential structures. We are unpersuaded. In discussing the dangers inherent in attempted burglary of a dwelling, the Court in James reasoned that the "risk arises not from completion of the burglary, but from the possibility that an innocent person might appear while the crime is in progress." Id. at 203. In addition to building occupants -- not a factor in this case -- the Court also noted the possibility of confrontation with police or bystanders who might investigate.[9] Id. These risks are present equally in Sanchez's third-degree "structure-curtilage" burglary convictions. We therefore conclude that those convictions satisfy the elements of the ACCA residual clause.

Finally, Sanchez argues that the district court ran afoul of Begay -- decided after his sentencing -- because his Florida convictions are not within the class of crimes that "are roughly similar" to the ACCA's enumerated examples. 128 S. Ct at 1585. Given that "burglary" is a listed example, this argument strains credulity. Moreover, given both the risks enumerated by the Court

_____

[8]The district court correctly noted that the fact James involved an attempted burglary, while Sanchez was convicted of "successful" burglary, inures to Sanchez's detriment. Sanchez does not engage this reasoning on appeal.

[9]As the district court noted, an unoccupied commercial building could be under surveillance by police, private security personnel or even the property owner.

in <u>James</u> and those identified by the district court, we have little difficulty concluding that Sanchez's Florida burglary convictions are "roughly similar, in kind as well as in degree of risk posed" to the ACCA's enumerated burglary example.  <u>Id.</u>

Appellant's conviction and sentence are **<u>affirmed.</u>**