In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 09-4055, 10-1626

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOSE GAYA and SALVADOR ROSALES,

*Defendants-Appellants*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 06 CR 896, 896-2—**Wayne R. Andersen**, *Judge*.

ARGUED JANUARY 11, 2011—DECIDED JUNE 14, 2011

Before EASTERBROOK, *Chief Judge*, and CUDAHY and POSNER, *Circuit Judges*.

POSNER, *Circuit Judge*.  The defendants were tried together by a jury, and convicted, of a number of cocaine offenses. Gaya was sentenced to 30 years in prison and Rosales to 20. The appeals present only procedural questions.

Gaya complains about the judge's denial of his request, made as the trial was about to start on the morning of May 6, 2008, for a continuance to enable him to find a

new lawyer. The government argues that he waived his objection to the judge's ruling because when the judge told him his only choice was between staying with his lawyer and representing himself, he chose the former. To waive a claim is to give it up voluntarily. It is doubtful that Gaya did that. The denial of his request for a continuance forced him to choose between staying with his current lawyer and representing himself; he sensibly chose the lesser of the two evils.

It would be different had he changed his mind and decided he *wanted* to stick with his lawyer. It's true that the judge said the lawyer was "an excellent lawyer" and that Gaya said "Yeah, it is fine, your Honor. I will just go with what you say. I will go with [his present lawyer]." But he said this after the judge had said: "I am not willing to put off the trial for you as a result of this." So Gaya's only choice was between representing himself and sticking with his current lawyer. The fact that he chose the latter course doesn't mean he was abandoning his request that the judge grant a continuance to enable him to find a new lawyer.

Which is not to say that he was entitled to a continuance. Had he told the judge, "I don't like my court-appointed counsel; I want you to appoint David Boies to represent me," and the judge had replied that he wouldn't do that and therefore Gaya had to choose between sticking with his existing counsel and representing himself, Gaya could argue on appeal that the judge should have appointed Boies, but of course the argument would fail. And similarly in this case, though

Gaya preserved his argument that he was entitled to a continuance the judge was justified in rejecting it. Gaya did not request the continuance until the morning on which the trial began, which (unusually) was several days after the jury had been picked. That had to be too late, in the absence of *really* exceptional circumstances, to entitle him to a continuance to seek a new lawyer. Eve of trial is usually too late. *United States v. Harris*, 394 F.3d 543, 552 (7th Cir. 2005); *United States v. Schmidt*, 105 F.3d 82, 89 (2d Cir. 1997); *United States v. Richardson*, 894 F.2d 492, 496-97 (1st Cir. 1990). To grant such a request after a jury is picked would, by marooning the jury, enable a defendant unhappy with that jury to try his luck with a new one, since the time required for him to find a new lawyer and for that lawyer to get up to speed would be too great for the original jury to be kept waiting for trial to begin.

The circumstances would not have justified granting the request even if a jury hadn't been picked. Gaya's lawyer, who was court-appointed, had filed his notice of appearance in the district court on December 6, 2007, and the trial began on May 6, 2008. He was Gaya's second lawyer; the first had been appointed shortly after his arrest, which occurred exactly one year before the second lawyer filed his notice of appearance. (Gaya is now on his fourth lawyer.) Gaya had appeared twice in court before May 6—at a status hearing on April 10 and when the jury was selected on April 30. And he had had ample opportunity during the previous five months to express to the court his dissatisfaction with his lawyer and desire for a different one. He could have

done that even if May 6 had been his first court appearance; had he told the lawyer at any time that he was dissatisfied with him and wanted his dissatisfaction conveyed to the court, the lawyer would have been duty-bound to comply. The reasons that Gaya gave the judge for his dissatisfaction with the lawyer (the lawyer "wasn't basing anything on my case. He wasn't defending me. He wasn't telling about for trial, nothing. Basically all the questions he was asking me, who is the key witness and if I wanted to cooperate") do not appear to have been of recent origin. Nothing had happened on the eve of trial to induce a dramatic change of mind about the lawyer's suitability. "Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983), quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

The case bears a superficial resemblance to *United States v. Sellers*, No. 09-2516, 2011 WL 1935735 at *3-*9 (7th Cir. May 19, 2011), which reversed the denial of a motion for a continuance sought as in this case to enable the defendant to obtain new counsel. The motion was filed only five days before trial was set to begin, but a jury had not been picked and the judge's grounds for the denial, which included complaints about the

behavior of a different lawyer in an unrelated case and annoyance that the judge had canceled his attendance at the Seventh Circuit judicial conference in order to conduct the trial, seemed arbitrary. Moreover, the trial had been scheduled to be held only two months after the defendant was arraigned.

Rosales, our second appellant, also complains about representation. He testified at trial, and shortly before the end of the first day of his testimony the prosecutor who was cross-examining him tried to show him a government exhibit consisting of phone records, intending to undermine Rosales' denial of being Gaya's cocaine supplier. Rosales' lawyer objected on the ground that the records should have been shown to the defense earlier. The prosecutor responded that they were not evidence but merely proposed impeachment materials. The judge adjourned the trial for the day and said he would hear argument about the phone records and resolve the dispute over them when court reconvened the next morning. He told Rosales' lawyer "don't discuss the subject [with Rosales], don't discuss the substance of his testimony with him, including this," the "this" doubtless referring to the phone records. The judge added that the lawyer could tell his client that "I've [i.e., the lawyer has] asked that you [Rosales] take a look at things [the phone records] before you testify, but the judge says it's in the middle of cross-examination and as he does in every other case, [the judge has] forbidden me to discuss the substance of testimony in the midst of cross-examination."

That night Rosales' lawyer filed a memorandum with the court arguing that his client had a right under the Sixth Amendment to discuss with him the substance of the phone records, along with other, unspecified matters, during the overnight recess. The judge didn't respond to the memo (he probably didn't see it till the next day) but instead ruled when trial resumed that he was barring all cross-examination based on the phone records. Rosales was never asked about them at the trial.

He argues that even if the judge had barred him from discussing with his lawyer just the phone records, the judgment must be reversed, though that error—if it was an error (it wasn't)—was harmless squared; the phone records were never used by the government at the trial and anyway the evidence of Rosales' guilt of all charges was overwhelming. The reason it wasn't an error is that all the judge was doing was postponing discussion of the phone records between lawyer and client until he was prepared to hear argument on whether to allow them to be used to impeach Rosales' testimony, and the issue became moot when the judge decided not to allow them to be used for that purpose or, as it turned out, any other one. For the judge after making that ruling to have ordered a further recess in order to allow Rosales and his lawyer to discuss how impeachment with the phone records might have been countered had the judge permitted their use for that purpose would have wasted everyone's time; the issue had become academic.

But Rosales goes further. He argues that the judge's ruling barred *all* communication with his lawyer during

the overnight recess, and that any impairment of a defendant's opportunity to consult with his lawyer, unless either utterly trivial or compellingly justified (or, preferably, both)—such as barring the defendant's lawyer from discussing the defendant's testimony with him during a 15-minute break in the defendant's cross-examination, given the "virtual certainty that any conversation between the witness and the lawyer would relate to the ongoing testimony," *Perry v. Leeke*, 488 U.S. 272, 283-84 (1989)—is a "structural error" necessitating reversal even if admitted by everyone to be harmless.

The opaque term "structural error" is best understood as denoting an error that can't (at least without inordinate burden or difficulty) be *determined* to be harmless. *United States v Marcus*, 130 S. Ct. 2159, 2165 (2010); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-51 (2006); *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991). If at the opening of the trial in this case the judge had said to our defendants "your guilt is so obvious that I'm going to dismiss the jury, skip the trial, and proceed directly to sentencing," it would be impossible to determine how certain their guilt really was, for if there were a trial the government's witnesses might recant or be discredited, or the defendants might unexpectedly testify convincingly. The inquiry into the harmlessness of the error in denying the defendants a trial would be the trial.

This understanding of "structural error" reconciles the cases with 28 U.S.C. § 2111, which states that "on the hearing of any appeal or writ of certiorari in any

case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties"—which is to say unless there is "a reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, *supra*, 130 S. Ct. at 2164; see also Fed. R. Crim. P. 52. If an "error might infect an entire trial," 130 S. Ct. at 2166, assessing how the trial might have gone had the error not been committed might well be impossible.

Thus, as the Supreme Court explained in *United States v. Gonzalez-Lopez*, *supra*, with specific reference to infringement of the right to counsel, the Justices base a finding "of structural error upon the difficulty of assessing the effect of the error." 548 U.S. at 149 n. 4. "Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad aspects of representation, . . . it is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." *Id*. at 150. In other words,

though the counsel the defendant had may have appeared to do a perfectly fine job, the counsel he wanted might have done better, and maybe even gotten his client off.

This is a tenuous basis for distinguishing, as the cases do, between a temporary interruption in representation (the overnight recess in this case), on the one hand, and ineffective assistance of counsel when there is no interruption, on the other. The defendant who has a lawyer, even an incompetent one, must to establish a violation of his constitutional right to effective assistance of counsel prove that he was prejudiced by the lawyer's incompetence, *Strickland v. Washington*, 466 U.S. 668, 687, 690-96 (1984); *Stephenson v. Wilson*, 619 F.3d 664, 671 (7th Cir. 2010)—and that's a lot harder to do than opposing a prosecutor's claim of harmless error, for the prosecutor must prove the harmlessness of a constitutional error—and prove it beyond a reasonable doubt. Compare *Massaro v. United States*, 538 U.S. 500, 505 (2003), with *Chapman v. California*, 386 U.S. 18, 24-26 (1967).

The Court in *Gonzalez-Lopez* grounded the difference in treatment between denial of the right to counsel of one's choice and denial of the right to effective counsel on the proposition that counsel cannot be said to be ineffective unless his performance is likely to have caused his client to lose the case. 548 U.S. 146-47. If the distinction seems excessively conceptual, two practical reasons support it: judges consider a judge's error more serious than a lawyer's error; and a lawyer's incompetence

is manifested in specific acts and omissions (more commonly the latter, such as failure to conduct an adequate investigation), and judges believe themselves able to assess the likely impact of specific acts or omissions on the outcome of the trial.

In any event the cases, whether rightly or wrongly, do deem interruptions in opportunities for communication between lawyer and client categorically graver than incompetent conduct of the defense—deem them candidates for structural error and hence insulated from an inquiry into whether the interruption was harmless. *United States v. Santos*, 201 F.3d 953, 966 (7th Cir. 2000); *United States v. Triumph Capital Group, Inc.*, 487 F.3d 124, 131 (2d Cir. 2007); *United States v. McLaughlin*, 164 F.3d 1, 4 (D.C. Cir. 1998). That is why, rather than saying that a 15-minute interruption is a harmless error, the courts tend to call it a "trivial" violation of the right to counsel, as in *United States v. Triumph Capital Group, Inc.*, *supra*, 487 F.3d at 134-35, which adds that it is "very different from a harmless error inquiry." *Id*. at 134, quoting *Peterson v. Williams,* 85 F.3d 39, 42 (2d Cir. 1996). But what's meant, as the two cases just cited make clear, is that the fact that the appellate court is confident that the defendant would have been convicted even if the error had not occurred does not excuse the error. It can be excused only if it was too slight to impair the defendant's right to counsel significantly.

Were the question in this case whether the interruption in the opportunity for lawyer-client communication had even a remote likelihood of changing the outcome

of the trial, the answer would be an emphatic "no"; the evidence of Rosales' guilt was overwhelming to the point of being conclusive. But that would be conventional harmless-error analysis. The analysis of harm applicable to a violation of the right to counsel focuses on the impact of the interruption on the ability of the defendant's lawyer to represent his client, even if the outcome was foreordained—even if Clarence Darrow and Perry Mason combined couldn't have obtained an acquittal of this defendant from a reasonable jury. To make this assessment in the present case we'd have to determine whether the discussions that Rosales' lawyer might have had with his client during the overnight recess at which he claims to have been enjoined to silence could have altered Rosales' responses when cross-examination resumed the next day, or in other words whether the answers he gave then might have been different had he discussed with his lawyer the forthcoming cross-examination (within the limitations of permitted coaching, on which see *Geders v. United States*, 425 U.S. 80, 89-91 and n. 3 (1976); *Serrano v. Fischer*, 412 F.3d 292, 302 (2d Cir. 2005)) during the overnight recess.

We needn't run this hare to the ground. The judge's error, if error there was, was invited by the harping of Rosales' lawyer on the phone records. "[A] party may not 'invite' error and then argue on appeal that the error for which he was responsible entitles him to relief." *United States v. Johnson*, 26 F.3d 669, 677 (7th Cir. 1994); see also *United States v. Rosby*, 454 F.3d 670, 677 (7th Cir. 2006); *United States v. Fulford*, 980 F.2d 1110, 1116

(7th Cir. 1992); *United States v. Jewell*, 614 F.3d 911, 919-20 (8th Cir. 2010). That is an *a fortiori* case of waiver, *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007); *United States v. Hamilton*, 499 F.3d 734, 736 (7th Cir. 2007), and there is no reason to exempt "structural errors." *Johnson v. United States*, 520 U.S. 461, 468-70 (1997); *United States v. Underwood*, 130 F.3d 1225, 1228-29 (7th Cir. 1997) (dissent from denial of rehearing en banc).

Read literally, the judge's ruling did forbid Rosales' lawyer to discuss the substance of the case, and not just the phone records, with his client during the recess. But the ruling should not be read literally. It was oral and spontaneous, and the phone records were its topic and trigger. If Rosales' lawyer had unrelated matters that he wanted to discuss with his client (or that he thought his client wanted to discuss with him) during the overnight recess, he should have told the judge that, reminding him of how dimly the courts look on interruptions of opportunities for communication between a criminal defendant and his lawyer.

When the judge announced the recess, the lawyer said: "I'm not going to give my client any information on how he should answer [the prosecutor's question about the phone records], but I do ask that I be able to meet with him and talk about this"—the "this" referring to the phone records. The prosecutor—rightly objecting to a witness's being shown or told the contents of an impeaching document before being asked the question that might provoke an answer that the document could be used to impeach, *United States v. Stevens*, 985 F.2d 1175,

1180 (2d Cir. 1993); *United States v. Randolph*, 456 F.2d 132, 136 (3d Cir. 1972); see *United States v. Cerro*, 775 F.2d 908, 914-15 (7th Cir. 1985)—suggested that the discussion be postponed to the next morning, before Rosales was cross-examined about the phone records. The judge agreed, but the discussion was never held because he ruled the next morning that the prosecutor couldn't ask Rosales about them.

Right after the judge had forbidden the lawyer to discuss the phone records with his client during the overnight recess, saying "don't discuss the substance of his testimony with him, including this" (the phone records), the lawyer asked whether he was "excluded from speaking to my client at all? If I don't talk to him about this, just about the process and the witnesses." The judge replied: "No, I think you can say to him that I've asked you take a look at things before you testify, but the judge says it's in the middle of cross-examination and as he does in every other case, he's forbidden me to discuss the substance of his testimony in the midst of cross-examination." The lawyer said "Okay," but then added: "So I can at least explain to him what's going on," and the judge said "Yeah" and the lawyer responded "Okay" and then the judge added: "you've been asked to be able to review documents with him that you think [the prosecutor] might wish to use, but I said it's in the middle of cross, no, and then we'll see what happens."

So the only thing clearly forbidden was discussing the phone records. Yet that night the lawyer filed a memo-

randum with the court in which he stated his under-standing that he was forbidden to discuss "any matter relating to the substance of [his client's] testimony" overnight and argued that the prohibition violated the Sixth Amendment. That was too late. The lawyer must have known that the judge wouldn't see the memo until the morning—when the overnight recess would be over.

The exchange between judge and lawyer over what if anything could be discussed during the overnight recess is rich in ambiguity. But the lawyer himself seems to think that it was mainly, maybe entirely, and in any event critically about the phone records. In the memo that he submitted to the district court that night he again asked to be allowed to discuss them with his client. And in his reply brief in this court he says that he "was *simply* asking for the ability to hear what his client had to say about the phone records" (emphasis added). Any discussion of subjects unrelated to the phone records probably would have been incidental, or even accidental, for his opening brief says "there is no way to know what information would have been exchanged or what other subjects would have been discussed had this conversation regarding the phone records and other substantive matters related to testimony and strategy occurred during the overnight recess." He insisted and still insists on his right to have discussed the phone records with his client. (He had no such right, as we said.)

Particularly telling is an exchange between him and the judge right after the judge said that the phone records

could not be used to impeach Rosales. The judge asked the lawyer whether therefore the cross-examination of his client could proceed and the lawyer responded: "Yes, I think we should go ahead with Mr. Rosales' testimony." Evidently the lawyer's only concern had been with the phone records, for with them out of the case he evinced no desire for any additional time for conferring with his client before the trial resumed.

In this court he fastens on one pair of words uttered by the judge—"including this" ("this" meaning the phone records)—to argue that the judge forbade him to discuss any testimony with his client during the recess. But had he been planning to discuss other matters with his client he should have said to the judge: "I'll stay completely away from the phone records, as you've directed, but I'd like permission—and I consider it my client's right under the Sixth Amendment—to discuss with my client testimony unrelated to the records." A judge's slip of the tongue, fatal if treated as a ruling but easily corrected by the lawyer adversely affected by it, is not a reversible error.

Rosales complains, finally, about the sentence. He was given a sentence enhancement because of a previous drug conviction that the government described as a conviction of "manufacturing/delivering cocaine." In fact, though that had been the charge, the conviction was for the lesser included offense of possession of cocaine. But the sentence stated in the government's submission describing Rosales' prior offense was accurate, and before his sentencing for his current offense the government

moved to amend its submission to correct the description of the sentence for the prior conviction. 21 U.S.C. § 851(a)(1). The judge allowed the amendment and imposed the enhancement. The government's error was beyond harmless—it was utterly inconsequential.

AFFIRMED.