# United States Court of Appeals
## For the First Circuit

No. 12-1012

UNITED STATES,

Appellee,

v.

JOSE LUIS MALDONADO,
a/k/a Edward de Jesus Meija Nunez,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Thompson, Selya, and Lipez,
Circuit Judges.

John F. Cicilline for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Peter F. Neronha, United States Attorney, was on brief, for
appellee.

February 13, 2013

**THOMPSON**, <u>**Circuit Judge**</u>.

## Backdrop

On an April morning in 2009, federal agents armed with a warrant searched suspected drug dealer Jose Maldonado and his apartment in Warwick, Rhode Island. They found plenty, coming up with bags of crack and powdered cocaine, over $6,500 in cash, a digital scale, and a driver's license indicating that he lived in nearby Cranston. Arrested and Mirandized, Maldonado talked to agents at the scene – telling them how much the crack taken from his jacket pocket weighed, describing the digital scale, and explaining how he ran his drug business from Warwick to shield his family in Cranston from the dangers associated with his line of work. Agents then asked for and received Maldonado's consent to search his Cranston home. And during that search they found pistols, ammunition, heroin, digital scales, drug presses, and materials that are mixed with crack and heroin in preparing them for sale at retail.

Later that day, Maldonado gave a tape-recorded confession, saying that he had been dealing drugs for about a year, that he had cooked the crack cocaine himself, and that the pistols were his. Agents then turned off the recorder, satisfied that they had gotten what they needed and ready to start the next phase of the investigation. But Maldonado kept talking, saying that he had actually been selling drugs for about eight years and that he would

usually buy about a kilogram of cocaine every two weeks for $33,000 a pop.  He also gave up some details about his drug sources.

Searching Maldonado's car the next day (a search done pursuant to a warrant, by the way), agents spotted a secret compartment behind the dashboard.  In it they found more crack cocaine, powdered cocaine, and heroin.

Eventually charged in a multicount indictment with drug and weapons offenses, Maldonado pled not guilty and later moved unsuccessfully to suppress the evidence seized at the Warwick and Cranston locales.  After many unusual twists and turns (more on this in a moment), a jury convicted him on all counts.  The district judge denied his new-trial motion without an evidentiary hearing and sentenced him to a total of 181 months in prison plus 5 years of supervised release.  Maldonado now appeals his convictions, but not his sentence, raising a slew of issues for our review.  None carries the day, as we shall see.

## Issues and Rulings

Maldonado's leadoff argument is that the district judge deprived him of his Sixth Amendment right to choose his own counsel.  To put that issue in context, we must go a little deeper into the facts.

After Maldonado's arrest, the district court appointed an assistant federal public defender named Kevin Fitzgerald to represent him.  Four months later, Maldonado retained private

counsel, Steven DiLibero, and Fitzgerald withdrew from the case. About three months after that, DiLibero withdrew, and court-appointed counsel Robert Mann took over. Mann stayed on for nine months, withdrawing after Maldonado hired attorneys Robert Watt and Jose Espinosa. For those keeping track, that makes <u>five</u> lawyers for Maldonado in a little over a year. And while we are tossing around numbers, by the time his trial was set to start, Maldonado had asked for and received <u>nine</u> separate continuances, resulting in months and months of delays.

On what was supposed to be the first day of trial, the jurors, witnesses, and lawyers arrived at the courthouse bright and early. But Maldonado threw a monkey wrench into the proceedings by refusing to leave his cell. After talking with counsel, the district judge asked Watt and Espinosa to go meet with Maldonado in prison.

During a telephone conference held later that day, Watt and Espinosa (reporting from a prison conference room) explained that Maldonado had said that he did not want them representing him and that John Cicilline was now his lawyer. Answering a question from the judge, Espinosa stressed that he believed Maldonado was competent to stand trial. Maldonado joined Watt and Espinosa at some point and told the judge that, yes, neither Watt nor Espinosa was his attorney. "You have attempted to manipulate the Court on past occasions," the judge stressed, and "I cannot allow you to

disrupt the proceeding and to insult the dignity of this judicial process . . . ." But Watt and Espinosa are "incompetent," Maldonado fired back. "I don't want them, period." The duo, the judge said, "are very skilled" lawyers who are "doing everything that they can do in your interest, even though you are making it very difficult for them." And, the judge reminded Maldonado, "Cicilline has not entered this case on your behalf," so "[h]e is not your attorney as far as the Court is concerned." Clearly agitated, Maldonado demanded that he be taken back to his cell.

Speaking with those who remained, the judge called Maldonado's attempted firing of counsel a "subterfuge" intended to "undermine these proceedings." "It's not a sincere dismissal," the judge found, and he suggested that the trial go forward with Watt and Espinosa as counsel. The assistant United States attorney prosecuting the case agreed, and so did Espinosa, who announced that he was ready, willing, and able to defend Maldonado. But because Maldonado would not leave his cell – to make things more difficult, he had taken off his clothes after getting off the teleconference – the judge sent the jury home for the day.

At a chambers conference the next morning, the judge disclosed that federal marshals had reported that Maldonado had spread his own feces and urine over his body in a bid to keep them from taking him to court. Marshals tried to get him to court later that day. But he put up a fight, and he ended up needing some

medical attention for a broken nose.  So the judge sent the jury home for a second time.  Cicilline then put on the record that he had told Maldonado that he would not enter an appearance in the case unless the judge granted a one-month continuance, and the judge explained that he would not grant a one-month continuance – particularly given that the jury was "in the box" and Maldonado had run through multiple attorneys already.  "[T]he record is now replete" with examples of Maldonado's "resistence," the judge found, adding that "all of the conduct, frankly, has been designed towards obstruction."

The following day, Maldonado finally appeared in court. Espinosa told the judge that Maldonado wanted him to pursue certain trial strategies that he (Espinosa) thought inappropriate.  And, Espinosa added, Maldonado made no bones about the fact that he wanted Cicilline to represent him.  Maldonado told the judge that he respected Watt and Espinosa, but he criticized them for not doing two things, principally:  asking the court to suppress his statements to police (he faulted the police for not having a Spanish-speaking officer present), and challenging a prospective juror whose husband worked for the Rhode Island State Police, though he was not a trooper, apparently.  Speaking up, Espinosa said that Maldonado also faulted him and Watt for not subpoenaing to a suppression hearing the state judge who had purportedly signed the search warrant (Maldonado believed that someone else had signed

-6-

the judge's name on that document).  And he explained the reasoning behind their decisions.  On the juror issue, for example, Espinosa stressed that he had been down to his last peremptory, that the prospective juror whom Maldonado had fixated on had proven her honesty and had shown that she would keep an open mind, and that another person needed to be stricken.  Espinosa spoke to the other issues too.  But that portion of the transcript is sealed, and, based on our review of the record (e.g., the transcript order form), we see that Maldonado never had that part transcribed.  See generally Fed. R. App. P. 10(b)(1)(A), (c) (requiring an appellant to procure the "transcript of such parts of the proceedings . . . as the appellant considers necessary" or, if no transcript is available, to "prepare a statement . . . of the proceedings from the best available means, including appellant's recollection"); Real v. Hogan, 828 F.2d 58, 60 (1st Cir. 1987) (explaining that "it is the appellant who must bear the brunt of an insufficient record on appeal").  Anyway, having taken it all in, the judge found no merit in any of the matters Maldonado had asked Watt and Espinosa to raise and no reason to grant an eve-of-trial continuance so yet another lawyer could take over.  Consequently, the judge gave Maldonado two choices:  continue with Watt and Espinosa (who were doing an "excellent" job, the judge said) or represent himself.

In a last-ditch effort to avoid trial, Maldonado claimed that he suffers from and receives treatment for schizophrenia.  He

asked Espinosa to ask the judge for a mental-health evaluation, and Espinosa obliged. But having observed Maldonado firsthand and heard counsel say that Maldonado was competent, the judge found that this was just another delay tactic and ruled that the trial would go forward – and it did, with Watt and Espinosa representing Maldonado.

With this background in place, we take on Maldonado's perceived counsel-of-choice problem. First, though, we should say that the government insists that Maldonado forfeited this issue by not developing it adequately below, meaning it is reviewable only for plain error – or so the government argues. But because Maldonado's claim is clearly meritless, we can and do bypass the government's forfeiture theory. See, e.g., United States v. Henry, 482 F.3d 27, 32 (1st Cir. 2007) (taking that tack in a similar situation); United States v. McIntosh, 380 F.3d 548, 555 (1st Cir. 2004) (same).

"In all criminal prosecutions," the Sixth Amendment declares, "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. That, of course, includes the right to retain counsel of one's choosing. See, e.g., United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006); United States v. Gaffney, 469 F.3d 211, 216 (1st Cir. 2006). But as important as that right is, it is not absolute. See, e.g., Wheat v. United States, 486 U.S. 153, 159 (1988);

Gaffney, 469 F.3d at 216.[1]  It must be balanced against the judge's need to ensure the orderly progress of the trial, for example. See, e.g., Gaffney, 469 F.3d at 216; United States v. Woodard, 291 F.3d 95, 106 (1st Cir. 2002).  And ultimately, a defendant's right to select his own counsel "cannot be insisted upon in a manner that will obstruct reasonable and orderly court procedure."  United States v. Neal, 36 F.3d 1190, 1205-06 (1st Cir. 1994) (internal quotation marks omitted).

Now, trial judges are busy people, obviously, operating under extreme pressure to manage exploding dockets fairly and efficiently.  See, e.g., United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995).  Necessarily, then, they must have "broad discretion" to control their calendars by granting or denying continuance motions – and because they do, "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel."  See Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (internal quotation marks omitted).  It surely goes without saying – but we say it anyway – that our review is for abuse of discretion, see, e.g., United States v. DeCologero, 530 F.3d 36, 78-79 (1st Cir. 2008), which occurs if no reasonable person could

---

[1] See also United States v. Proctor, 166 F.3d 396, 402 (1st Cir. 1999) (noting that, in the right situation, a district judge may make a defendant pick between going "to trial with an unwanted attorney and representing himself").

agree with the judge's ruling, see <u>Hutchinson ex rel. Julien</u> v. <u>Patrick</u>, 636 F.3d 1, 15 (1st Cir. 2011). Also and importantly, to win here, the party denied the continuance must show that the judge's decision caused specific, "substantial prejudice." <u>Saccoccia</u>, 58 F.3d at 770.

Moving from the general to the particular, Maldonado complains that the judge kept his preferred attorney, Cicilline, from representing him, which, he contends, robbed him of his constitutional right to chosen counsel. He could not be more wrong. With jurors, witnesses, and lawyers (the prosecutor, plus Watt and Espinosa) ready to go, the judge made it crystal clear that Cicilline could enter his appearance but that the trial would proceed as planned, noting (among other things) that Maldonado had already received <u>nine</u> continuances and had gone through <u>three</u> attorneys before hiring Watt and Espinosa (his <u>fourth</u> and <u>fifth</u> lawyers). And it was <u>Cicilline</u> who balked at entering the case on those terms. Critically, nothing in the Sixth Amendment gave Maldonado the right to insist on the one-month continuance that Cicilline demanded as a precondition for his entry – at least Maldonado cites no case, and we know of none, that holds otherwise.

Cutting to the chase, we see no hint of an abuse of discretion here. Again, the continuance request came on the day set for the trial to begin – after the court had granted not one, not two, but nine continuances (as we have said, with tireless

-10-

repetition), delaying matters for months on end.[2]  The jury had already been picked.  Witnesses and lawyers (the prosecutor and the Watt/Espinosa tandem) had arranged their schedules to be there.[3] So had the judge.  But Maldonado took a defiant stance, pulling out all the stops to jam-up the proceedings.  Recall how he had smeared his bodily waste on himself and had brawled with marshals.  Recall also how the judge – having lived with the case for some time (so he knew the protagonists fairly well) and having held multiple conferences to sort out this sorry tangle – expressly found that Maldonado's day-of-trial bid to switch out Watt and Espinosa for Cicilline was nothing but obstructionism.  And recall too how Maldonado's desperate attempt to game the system had caused the

---

[2] See, e.g., DeCologero, 530 F.3d at 79 n.27 (calling a continuance motion made on the first day of trial "untimely"); United States v. Rodriguez-Marrero, 390 F.3d 1, 22 (1st Cir. 2004) (similar for a motion made the day before trial); Neal, 36 F.3d at 1205-06 (ditto for a motion made ten days before trial); see also United States v. Ademaj, 170 F.3d 58, 64-65 (1st Cir. 1999) (calling a challenge to a continuance motion made on the first day of trial (after there had been "a nine-month delay resulting from five previous continuances") "frivolous").

[3] See, e.g., Morris, 461 U.S. at 11 (holding that inconvenience to jurors, witnesses, and lawyers is a key factor for judge's deciding continuance motions in the counsel-of-choice context); United States v. Gaya, 647 F.3d 634, 636 (7th Cir. 2011) (Posner, J.) (noting that granting a continuance "after a jury is picked would, by marooning the jury, enable a defendant unhappy with that jury to try his luck with a new one," since the time needed for him to get his new counsel "up to speed would be too great for the original jury to be kept waiting for trial to begin").

judge to send jurors and witnesses home two days in a row.[4]  Sure, as a newcomer to the case, Cicilline no doubt had his reasons for wanting a 30-day continuance (as opposed to a shorter term), though he did not spell them out on the record before the judge ruled. But having measured that request against the appropriate factors – including the lateness of the plea, the amount of time previously available for preparation (thanks to nine other previously-granted continuances), the extent to which Maldonado's own actions caused his claimed predicament, the inconvenience to others should another continuance follow, and the availability of assistance from Watt and Espinosa – the judge was justified in drawing a line in the sand.  Cf. Saccoccia, 58 F.3d at 770-71 (discussing the balancing of factors).

On top of that, Maldonado makes no showing of specific and compelling prejudice necessary to win here.  He vaguely suggests that his pined-for sixth attorney (Cicilline) would have pursued different pretrial strategies – moving to suppress his incriminating statements, disputing the authenticity of the state judge's signature on the search warrant, striking a different potential juror.  But he does not persuade us that these hinted-at maneuvers had any realistic prospect of success, let alone that

---

[4] See, e.g., Gaffney, 469 F.3d at 216 (stressing that a defendant cannot use the right to counsel as a means to manipulate the court "or hamper the prosecution") (internal quotation marks omitted); Woodard, 291 F.3d at 106 (similar).

they could in any way have affected the verdict, so his argument fails. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 771 (rejecting a defendant's prejudice theory because it lacked "any colorable basis for assuming that his supposition was anything more than the most remote of possibilities").

Given this concatenation of circumstances, we cannot say that the judge acted in an unreasoning and arbitrary way. Undaunted, Maldonado spends some time discussing <u>United States</u> v. <u>Allen</u>, 789 F.2d 90 (1st Cir. 1986) – too much time, actually. <u>Allen</u> outlines factors relevant in reviewing denied motions to replace <u>appointed</u> counsel. <u>Id.</u> at 92. The catalog includes the timeliness of the substitution motion; the adequacy of the judge's inquiry into why the attorney-client relationship supposedly soured; and whether their beef was so profound that it caused a "total" breakdown in communication, preventing counsel from effectively presenting an "adequate defense." <u>Id.</u> Abuse-of-discretion review applies to that issue too. <u>Id.</u>

Though he tries mightily, Maldonado can get no mileage from <u>Allen</u>. For starters, we have our doubts about whether the <u>Allen</u> factors apply in cases like this one involving privately-retained counsel. <u>See</u> <u>Woodard</u>, 291 F.3d at 107 (raising that very question and explaining why the <u>Allen</u> factors may not be a good fit for this situation). But we need not resolve them, because even assuming that the <u>Allen</u> test holds sway here, Maldonado has not

-13-

shown any reversible error, given the events described above: Again, his effort to jettison Watt and Espinosa came too late in the day. Also, the judge conducted a thorough and thoughtful inquiry. See, e.g., Woodard, 291 F.3d at 108 (noting that "[t]he extent and nature of the inquiry may vary in each case; it need not amount to a formal hearing"). Finally, regarding the nature of the alleged conflict between counsel and client, Maldonado basically says that he had lost trust in team Watt/Espinosa. But that, by itself, is not sufficient, as he candidly admits – instead, the defendant must offer up a "legitimate reason for his loss of confidence." Id.; see also United States v. Myers, 294 F.3d 203, 206 (1st Cir. 2002) (adding that "[g]ood cause depends on objective reasonableness; it cannot be gauged solely by ascertaining the defendant's state of mind"). And this is where he gets tripped up. True, he blasts his lawyers for not doing what he says they should have done – seeking to suppress his damning statements, contesting the state judge's signature on the warrant, and using the final peremptory challenge differently. Remember, though, that Espinosa explained the thinking behind his and Watt's approach (partly during a sealed sidebar) – explanations that the judge accepted, finding that Maldonado's complaints "don't have any real merit." And that dooms Maldonado's Allen-based argument, given that counsel is not required "to pursue weak options when it appears, in light of informed professional judgment, that a defense is implausible or

insubstantial." Woodard, 291 F.3d at 108 (internal quotation marks omitted).

The bottom line is that we see no reason to second-guess the judge's decision on the choice-of-counsel issue. So we soldier on.

Next up is Maldonado's claim that the judge slipped in finding him competent for trial without first ordering a psychiatric exam. To succeed, Maldonado must show facts that create "a real, substantial and legitimate doubt" about his competency. United States v. Brown, 669 F.3d 10, 17 (1st Cir. 2012) (internal quotation marks omitted). Reviewing the judge's findings, we see nothing resembling an abuse of discretion, which is the standard that applies when a judge denies a request for a competency evaluation, see United States v. Maryea, No. 11-2239, 2013 WL 150316, at *11 (1st Cir. Jan. 15, 2013). We explain briefly.

Competency here requires that the defendant have the ability both to comprehend the nature of the proceedings and to assist counsel in preparing his defense. See, e.g., Dusky v. United States, 362 U.S. 402, 402 (1960); United States v. Widi, 684 F.3d 216, 220-21 (1st Cir. 2012) (noting that "[a] defendant may have serious mental illness while still being able to understand the proceedings and rationally assist his counsel"). With that in mind, we have good reasons to leave the judge's competency decision

-15-

alone.  For one thing, Maldonado's own privately-selected lawyer (Espinosa) considered Maldonado competent – something that carries "great weight" with us, given "counsel's unique vantage."  Widi, 684 F.3d at 220 (internal quotation marks omitted); see also Brown, 669 F.3d at 17.  For another, the judge got to see and hear Maldonado firsthand (they interacted quite a bit, the reader will recall), and Maldonado was hardly incoherent (as a review of the transcripts confirms) – a factor that also supports the judge's ruling.  See, e.g., Widi, 684 F.3d at 220; United States v. Sanchez-Ramirez, 570 F.3d 75, 81 (1st Cir. 2009).  Also, the record reveals that Maldonado had no trouble consulting with and assisting counsel at different stages – yet one more consideration showing that his incompetency theory will not fly.[5]  See, e.g., Brown, 669 F.3d at 17-18.

Searching for a way around all this, Maldonado again talks about the time that he covered himself with feces and urine. Only a plainly incompetent person would have done that, he suggests.  But as the judge supportably found, that was just

---

[5] Given the stunts that Maldonado had pulled, the judge purposely kept a close eye on him during court proceedings.  And "I have to say," the judge later said, "that I never at any time observed anything to give me the slightest bit of concern about [his] ability to participate effectively in his own defense with counsel."  Actually, "there were many, many times when [Maldonado] was communicating with trial counsel," the judge added, showing that "he was more than fully engaged" as events played out.

another desperate ploy to avoid trial.  So it does not change our conclusion.

Neither does his complaint that his lawyers should have gotten his psychiatric records from a community-health center – records that he says would have shown his unfitness for trial. This is really a claim that his attorneys provided ineffective assistance, which typically requires a showing that counsel performed deficiently and prejudiced the outcome of the case.  See, e.g., Strickland v. Washington, 466 U.S. 668, 687 (1984).  And that is a problem for Maldonado, because our practice is not to review ineffective-assistance claims on direct appeal, except in the rare instance when the record is sufficiently developed for us to weigh in.  See United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993) (laying out the rationale for this practice in exquisite detail). Maldonado's claim falls within the general rule, not the seldom-seen exception to it, given that we do not know for sure why counsel did what they did, for example.  See United States v. Moran, 393 F.3d 1, 10-11 (1st Cir. 2004) (finding an ineffective-assistance claim pressed on direct appeal premature because it was impossible to tell whether counsel's decision was strategic or an oversight).  The upshot is that if Maldonado wants to pursue this claim, he must do so by filing a motion under 28 U.S.C. § 2255. See Mala, 7 F.3d at 1063 (holding that when the lower-court record is too skimpy to be helpful, "we have routinely dismissed the

relevant portion of the appeal without prejudice to the defendant's right to litigate his ineffective assistance claim through the medium of an application for post-conviction relief"); see also United States v. Guerrier, 669 F.3d 1, 9 (1st Cir. 2011) (similar, collecting additional cases).

The same is true for four of his other claims. The first three should be familiar to the reader by now: his knocking counsel for not moving to suppress his incriminating comments, not questioning the genuineness of the state judge's signature on the warrant, and not using the last peremptory strike against another potential juror. The fourth concerns his claim that he did not testify at trial because of counsel's bad advice (they had a warped view of the evidence, he says) – advice given when (he says) he was too affected by prescription drugs to make a wise choice. These claims are actually ineffective-assistance claims. And here too there are too many unknowns to permit meaningful review – unknowns like what motivated counsel to make the choices that they made (Espinosa offered rationales for the tack he and Watt took, but some of that happened during a sealed sidebar), and who said what to whom and when, and what state Maldonado was really in when it mattered, and (assuming errors in the defense) whether there is a reasonable probability of a different result. We reject these claims, then, though he can renew them (if he wishes) in a § 2255 petition. See, e.g., Mala, 7 F.3d at 1063.

Which brings us to Maldonado's last issue, whether the judge stumbled in denying his new-trial motion – a question we review for abuse of discretion.[6]  See, e.g., United States v. Hall, 557 F.3d 15, 19 (1st Cir. 2009).  Stripped to its essentials, his new-trial theory is little more than a repackaging of his counsel-of-choice, competency, and judicial-signature arguments that we already have brushed aside.  Given this, we cannot say that the judge abused his discretion here.[7]  See, e.g., United States v. Kelly, 722 F.2d 873, 882 (1st Cir. 1983) (holding that because "[t]he grounds for this [new-trial] motion were mainly the same contentions already discussed" and rejected, the judge did not "abuse [her] discretion in denying defendant's" new-trial request).

## Conclusion

Our review over, we affirm the judgment below but without prejudice to Maldonado's right to raise his ineffective-assistance claims (if he so chooses) in a § 2255 petition.  Naturally, we take no position on how a petition like that might fare.

---

[6] The government suggests that Maldonado may have filed his new-trial motion beyond the limits set in Fed. R. Crim. P. 33(b)(2).  But, commendably, the government also says that we should skip over the timeliness issue because prosecutors did not raise that concern below, and so we shall.  See generally United States v. Alverio-Meléndez, 640 F.3d 412, 423 n.6 (1st Cir. 2011) (bypassing a timeliness argument because the new-trial arguments failed "on the merits").

[7] Maldonado criticizes the judge for not holding an evidentiary hearing on his new-trial motion.  But he does not seriously develop that argument, offering us no authority for it, so we deem it waived.  See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).