**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

       Plaintiff–Appellee,

v.

CEDRIC DUANE BURKS,

       Defendant–Appellant.

Nos.   10-4180 &
10-4210

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:07-CR-00173-TS-4)**

Robert Breeze, Salt Lake City, Utah, for the Defendant-Appellant.

Jared C. Bennett, Assistant United States Attorney (Carlie Christensen, United States Attorney, with him on the brief), Office of the United States Attorney, District of Utah, Salt Lake City, Utah, for the Plaintiff-Appellee.

Before **LUCERO**, **HOLLOWAY**, and **TYMKOVICH**, Circuit Judges.

**LUCERO**, Circuit Judge.

Cedric Burks provided codes to an auto-theft ring that were used to create working keys for specific vehicles. One such vehicle—an Escalade—was stolen in Nevada, stripped to its frame, and subsequently discovered and auctioned by authorities. Several months later, the same Escalade, now reassembled, was identified in Utah. Based on this discovery, Burks was charged and convicted of aiding and abetting the possession and transportation of a stolen vehicle under 18 U.S.C. §§ 2312 and 2313.

On appeal, Burks argues that the jury was improperly instructed on the affirmative defense of withdrawal and was allowed to make an improper inference that Burks' associates knew the vehicle was stolen. We disagree on both points. First, assuming that withdrawal is an affirmative defense to a conviction premised on accomplice liability, we hold that the jury was properly instructed that the burden of proving the defense rested on Burks. Second, we hold that the jury was properly instructed that it could infer that Burks' associates knew the vehicle was stolen. We also reject Burks' claims that there was insufficient evidence to support his conviction and that the district court erred in its restitution order. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

Burks was a player in an auto-theft ring operated by Levi and Abraham Elliot based in Las Vegas, Nevada. Once an automobile was targeted for theft, the Elliots would provide Burks with the automobile's unique vehicle identification number ("VIN"). Using this information, Burks would contact a local auto dealership and claim

that he was purchasing the vehicle in question and needed the vehicle's "key code"[1] in order to make a key for the vehicle. Unaware of the foul play, the dealership employee would give Burks the code. Burks then passed the key code to the Elliots, who would compensate him and use the code to make a key to steal the vehicle in question. According to the dealership employee, Burks requested approximately twenty key codes in 2005.

One vehicle targeted by the Elliots was a 2004 Cadillac Escalade, fitted with a custom grille and wheels. In accordance with the plan, Burks was given the Escalade's VIN and obtained its key code from his dealership contact. The vehicle's owners reported it stolen soon thereafter. Several days later, Las Vegas police recovered the Escalade's frame, which had been completely stripped of its doors, seats, grille, wheels, and various other instruments. Notably, all of the electronic wires were neatly clipped and bundled, and the frame had been smeared in oil to protect it from the weather. Upon recovery, the Escalade's frame was sold at auction to Abe Elliot, who received legal title to the frame along with a Nevada certificate declaring the vehicle to be non-reparable.

At some point in the following three months, the Escalade was reconstructed and Caesar "Spanky" Martinez purchased insurance for the vehicle in Utah. Martinez subsequently became a suspect in federal and state investigations into a string of auto

---

[1] A key code is a unique sequence of numbers that a manufacturer assigns to an individual vehicle to allow the vehicle's owner to make duplicate keys. An individual in possession of a key code for a particular vehicle can make an unlimited number of working keys for that vehicle.

thefts in Utah and Nevada. While investigating Martinez, authorities noticed an Escalade at his house, and after some research, discovered that the Escalade was likely the same one that had been stolen, stripped, and auctioned in Las Vegas. The identity of the Escalade was confirmed when law enforcement used the stolen vehicle's recorded VIN and key code to make a working key, which was used to seize the vehicle from Martinez.

The Escalade's ties to Nevada and the Elliots became more apparent after Martinez was arrested. First, Abe Elliot called the Utah state motor vehicle division to inquire about the status of the Escalade. Another man, who gave the name of Ralph Scalbon, also called to report the vehicle stolen, but provided the same callback number as Abe Elliot. This Scalbon moniker closely resembled the name of the individual who allegedly sold the Escalade to Martinez. Finally, Abe Elliot himself sought to claim the vehicle and was arrested after arriving with a working key.

Law enforcement traced the Escalade back to Burks, who had been arrested for attempting to sell key codes. Once in custody, Burks confessed to selling codes to the Elliots as part of their auto-theft scheme. Additionally, Burks stated that he was aware that the Elliots operated in Utah, and did business with an individual named "Spanky." Following his arrest, however, Burks stopped selling key codes and helped authorities infiltrate the Elliots' auto-theft ring.

Based on Burks' confession, he was charged with aiding and abetting: (1) the interstate transportation of the stolen Escalade under 18 U.S.C. § 2312; and (2) the possession, receipt, and storage of the stolen Escalade under 18 U.S.C. § 2313. At trial,

-4-

Burks' counsel objected to two jury instructions now at issue. The first instruction informed the jury that the burden of proving the affirmative defense of withdrawal rested with the defendant. The second instruction permitted the jury to infer that a vehicle stolen in one state and recovered in another was knowingly transported in interstate commerce. Both objections, however, were overruled, and the jury convicted Burks on both charges.

Following Burks' conviction, the district court held a restitution hearing to determine how much compensation was due to the owners of the stolen Escalade. After the Escalade was stolen, the vehicle's owners filed a claim with their insurance company, which paid to replace the Escalade but charged the owners a $1,000 deductible. Accordingly, the district court ordered that Burks pay $1,000 to the Escalade's owners and $49,977 to the insurance company, which represented the amount paid to the Escalade's owners minus the sum recovered from the sale of the vehicle's frame at auction. Burks timely appealed both his conviction and the restitution order, and we consolidated the appeals.

## II

On appeal, Burks raises several novel questions about the interplay of the federal auto-theft statute, known as the Dyer Act and codified at 18 U.S.C. §§ 2312 and 2313, and the federal accomplice liability statute, 18 U.S.C. § 2(a). We thus begin our analysis by looking at each of these statutes respectively.

Burks was convicted under two distinct sections of the Dyer Act: §§ 2312 and

2313. Section 2312 prohibits the transportation in interstate commerce of a vehicle that is known to be stolen, and § 2313 prohibits the receipt, possession, or storage of a vehicle that crossed state lines and is known to be stolen. As the Supreme Court has acknowledged, the Act reflects a realization that "[p]rofessional thieves resort to innumerable forms of theft[,] and Congress presumably sought to meet the need for federal action effectively rather than leave loopholes for wholesale evasion." United States v. Turley, 352 U.S. 407, 416-17 (1957).

Burks was not convicted as a principal under the Dyer Act, but as an accomplice under the federal accomplice liability statute. Under 18 U.S.C. § 2(a), "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." "To be guilty of aiding and abetting the commission of a crime, the defendant must willfully associate himself with the criminal venture and seek to make the venture succeed through some action of his own." United States v. Leos-Quijada, 107 F.3d 786, 794 (10th Cir. 1997). In establishing that the defendant was an accomplice, the government may rely on "circumstantial evidence and the level of participation may be of relatively slight moment." Id. (quotation omitted).

The Dyer Act and accomplice liability statute, operating together, provide the basis for Burks' convictions. For his conviction under § 2312, the government was required to prove: (1) a person transported a stolen vehicle that crossed state lines; (2) the person knew the vehicle was stolen; and (3) Burks associated himself with the

-6-

principal and sought to make the venture succeed.  For his conviction under § 2313, the government was required to prove:  (1) a person received, possessed, or stored a stolen vehicle that crossed state lines; (2) the person knew the vehicle was stolen; and (3) Burks associated himself with the principal and sought to make the venture succeed.

## A

Burks first claims the jury was improperly instructed on the affirmative defense of withdrawal.  At trial, Burks argued that he should be shielded from conviction because he effectively withdrew from the Elliots' auto-theft ring.  This defense was premised on the fact that Burks stopped selling key codes and actually helped authorities infiltrate the criminal enterprise after he sold the Escalade's key code to the Elliots.  The district court accepted this as a valid defense, but instructed the jury that "[t]he defendant has the burden of proving that he withdrew from the enterprise by a preponderance of the evidence."  We review "a court's decision to give a particular jury instruction for an abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law."  United States v. Gwathney, 465 F.3d 1133, 1142 (10th Cir. 2006).

In this circuit, withdrawal is an established affirmative defense to a defendant's involvement in a conspiracy.  United States v. Randall, 661 F.3d 1291, 1294 (10th Cir. 2011).  "[T]o establish the affirmative defense of withdrawal from a conspiracy, a defendant must disclose the scheme to law enforcement authorities or make a reasonable effort to communicate his withdrawal to his coconspirators."  Id. (citation omitted).  Yet

-7-

it is unsettled if a defendant can withdraw from aiding and abetting a crime. Unlike a conspiracy, which by its very nature involves an agreement that can be refuted, accomplice liability can arise from merely encouraging the principal. See United States v. Whitney, 229 F.3d 1296, 1303 (10th Cir. 2000) ("One may become an accomplice . . . by words or gestures of encouragement . . . .") (quotation and alteration omitted). Given the relatively minor participation that can trigger accomplice liability, it is unclear what actions an individual may take—if any—to immunize himself from liability for a crime that he previously enabled.

Other courts have reached varying results when considering the applicability of the withdrawal defense to the federal accomplice liability statute. The Seventh Circuit, for example, has held that withdrawal was not a valid defense for aiding and abetting mail and securities fraud. United States v. Read, 658 F.2d 1225, 1239-40 (7th Cir. 1981) (withdrawal is not a defense because "as an aider and abettor, [the defendant] need not agree to the scheme. He need only associate himself with the criminal venture and participate in it"). The Second Circuit has also held that withdrawal is not a valid defense to aiding and abetting, at least for some crimes. See United States v. Arocena, 778 F.2d 943, 948 n.3 (2d Cir. 1985) ("[W]ithdrawal is not a defense to the substantive crime of aiding and abetting a murder."). In contrast, the Ninth Circuit has assumed—albeit in dicta—that a defendant can withdraw from being an accomplice. United States v. Lothian, 976 F.2d 1257, 1261 (9th Cir. 1992) ("Withdrawal is traditionally a defense to crimes of complicity: conspiracy and aiding and abetting.").

-8-

Every court to foreclose the withdrawal defense to an accomplice has closely examined the elements and nature of the underlying crime and limited their holding to that crime. We see no reason to depart from this prudent practice, and decline the government's suggestion to categorically hold that withdrawal can never be a valid defense to aiding and abetting a federal crime.

Turning to the underlying crime at issue, it is conceivable that a defendant could withdraw from aiding and abetting a Dyer Act violation. But even assuming that withdrawal was a valid defense, we reject Burks' contention that the government should have to prove its absence. The burden of proving withdrawal in the conspiracy context unequivocally rests with the defendant, and we see no basis for distinguishing situations when accomplice liability is at issue. See United States v. Hughes, 191 F.3d 1317, 1322 (10th Cir. 1999) ("In this circuit, the law is clear that the defendant bears the burden of establishing withdrawal from a conspiracy."). The district court thus did not abuse its discretion in instructing the jury on this point.

**B**

Burks also objects to a jury instruction permitting the inference that the Escalade was transported to Utah by an individual who knew it was stolen. Specifically, the jury was instructed that "[p]ossession in one state of a vehicle that was recently stolen in another state, if not satisfactorily explained, is ordinarily a circumstance from which you may infer that the person knew the vehicle was stolen and also transported in interstate commerce." Burks timely objected to this instruction, and now argues that it was unfair

to require him to prove or disprove the mindset and actions of a third party.

Although we have upheld this inference in cases involving the Dyer Act, we have not addressed its applicability when the defendant is not the principal. Cf. Rogers v. United States, 416 F.2d 926, 927 (10th Cir. 1969) ("Proof that an accused is in possession of a vehicle recently stolen in another state sustains the inferences that he knew the vehicle was stolen and that he transported it in interstate commerce."). Typically, an inference is permissible if "there is a rational connection between the fact proved by the prosecution and the ultimate fact presumed, and the inferred fact is more likely than not to flow from the proven facts." Gwathney, 465 F.3d at 1143. Under this definition, there will be scenarios in which the connection between the crime and the defendant is so indirect that an inference instruction is inappropriate. Burks' case, however, presents no such scenario.

The evidence presented by the government provided a solid foundation for inferring that Martinez knew the vehicle was stolen and had crossed state lines. Burks himself admitted that Martinez was involved in the Elliots' Nevada-based auto-theft ring. The prosecution also showed that after the Escalade was recovered in Utah, the Elliots tried to claim it. This evidence, which tends to show that Martinez was a key player in the Elliots' scheme, is clearly sufficient to support the inference that Martinez's possession of the vehicle meant that he knew the vehicle had been stolen and that it had crossed state lines. The jury instruction was thus appropriate.

Burks maintains that the inference is only appropriate if the defendant is in actual

possession of the vehicle.  To this end, he cites <u>Rogers</u>, which held that "[t]he basis of the inferences is the possession of the vehicle . . . [a]bsent possession no inference may be drawn."  416 F.2d at 928.  But <u>Rogers</u> states only that the person for whom the inference is made must have been in possession, and Martinez was unquestionably in possession of the vehicle before it was recovered in Utah.  There is nothing in <u>Rogers</u> to suggest that the inference may only be made in reference to the defendant at trial.

## C

Burks alleges that there was insufficient evidence to convict him at trial.  We review the sufficiency of the evidence de novo.  <u>Whitney</u>, 229 F.3d at 1300.  "[W]e ask only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt."  <u>United States v. Keck</u>, 643 F.3d 789, 793 (10th Cir. 2011).

In order to convict Burks, the government was required to prove:  (1) a person transported (for liability under § 2312 ) and received, possessed, or stored (for liability under § 2313) a stolen vehicle that crossed state lines; (2) the person knew the vehicle was stolen; and (3) Burks associated himself with the principal and sought to make the venture succeed.   Burks first claims that the government could not prove the vehicle crossed state lines with the knowledge that it was stolen because it is unclear who transported the vehicle.  We disagree.  The government presented an array of evidence showing the Escalade was stolen by the Elliots in Nevada and found in Utah in

-11-

possession of Martinez, a known associate of the Elliots. Given this evidence, the jury could properly infer that whoever transported the vehicle from Nevada to Utah—presumably some player in the Elliots' ring—knew it was stolen.

Burks also alleges that the Escalade was not actually stolen when it crossed state lines. To this end, Burks emphasizes that after the Elliots stole, stripped, and abandoned the vehicle, it was recovered by authorities, which he argues rendered the Escalade frame "unstolen." Because the Elliots legally purchased the "unstolen" frame, the reconstructed Escalade was allegedly not stolen when it crossed into Utah, and was thus outside the scope of the Dyer Act. See generally United States v. Muzii, 676 F.2d 919, 923 (2d Cir. 1982) (discussing recovered property doctrine). This argument, while admittedly clever, is not persuasive. The Dyer Act was intended to cover a wide range of activities, and passed as an effort to close loopholes that auto thieves had exploited. Turley, 352 U.S. at 416-17. In the instant case, thieves stripped the Escalade and allowed it to be recovered with the intention of re-purchasing the vehicle so they could obtain legal title to it. To hold that the transportation and possession of the Escalade did not violate the Dyer Act because the authorities were made an unwitting link in the chain of theft would create an illogical loophole in direct contradiction to Congress' intent. See United States v. Payne, 635 F.2d 643, 645 (7th Cir. 1980) (holding that interstate transportation of vehicle parts severed from a stolen a truck violated the policy of the Dyer Act). We therefore decline to apply to the recovered property doctrine to situations in which a thief abandons the vehicle with the intention of purchasing it once it has been recovered by authorities.

-12-

As a final point, Burks asserts that his involvement in providing the key codes to the Elliots is not sufficiently material to show that he associated himself with the crime of transporting and possessing the Escalade in another state. The standard for finding that a defendant aided or abetted a crime is not a high one; "[c]onduct of the defendant or special circumstances may justify the inference that the defendant associated himself with the criminal objective." Whitney, 229 F.3d at 1303 (quotation omitted). Furthermore, "[i]t is well settled that knowledge by the defendant that the vehicle was moving in interstate commerce is not an essential element of an offense under [the Dyer Act]." United States v. Smith, 461 F.2d 246, 247 (10th Cir. 1972). This is because "[t]he essence of the offense is the fraudulent scheme itself and the interstate element is only included to provide a constitutional basis for the exercise of federal jurisdiction." United States v. Newson, 531 F.2d 979, 981 (10th Cir. 1976). Thus, it does not matter if Burks knew the Escalade was going to be transported to Utah or end up in Martinez's possession. See also United States v. Hayes, 739 F.2d 236, 238 (6th Cir. 1984) (holding that it is not necessary to prove an accomplice to a Dyer Act violation knew of the stolen vehicle's movement in interstate commerce). It is enough that Burks provided key codes to the Elliots with full knowledge that the vehicles would be stolen and the relative scope of their auto-theft ring.

**III**

Burks contests the district court's restitution order requiring him to pay $1,000 to the Escalade's owners and $49,977 to the owners' insurance company under the

Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. We review an MVRA restitution order for an abuse of discretion, although the application of the statute is reviewed de novo and the factual findings for clear error. United States v. James, 564 F.3d 1237, 1242 (10th Cir. 2009).

Under the MVRA, the district court must award restitution for "any offense . . . against property under [United States Code Title 18] . . . in which an identifiable victim suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1). Dyer Act violations are clearly within that provision's scope, and both the Escalade's owner and their insurance company are identifiable victims. Accordingly, restitution under the MVRA is mandatory. The statute requires that the victims be compensated "the full amount of their losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).

The district court determined that returning the vehicle to its owner was not practical because the vehicle's unsavory history had left it unsuitable for street use. Based on this determination, the court was required to award "the greater of (I) the value of the property on the date of the . . . loss . . .; or (II) the value of the property on the date of sentencing." § 3663A(b)(1)(B)(i). This amount was to be offset by "the value (as of the date the property is returned) or any part of the property that is returned." § 3663A(b)(1)(B)(ii). Taking this into account, the court determined the actual loss to the victims to be $50,977: $1,000 to compensate the Escalade's owners for the deductible they paid and $49,977 to compensate the insurance company for replacing the Escalade.

-14-

On appeal, Burks argues that the district court erred by not subtracting the residual value of the vehicle, which at the time of the order was not in the victims' possession. According to Burks, the vehicle was worth approximately $30,000 when it was recovered; he contends that amount should have been subtracted from the loss to the victims. But a restitution order under the MVRA "must be based on actual loss," United States v. Parker, 553 F.3d 1309, 1324 (10th Cir. 2009), and may only be offset by the value of the property "returned" to the victim, § 3663A(b)(1)(B)(ii). Given this mandate, the district court properly declined to offset the actual loss suffered by the speculative value of the vehicle when returned to a victim in the future.[2]

## IV

We **AFFIRM** Burks' conviction and **AFFIRM** the district court's restitution order.

---

[2] The district court noted that the government had agreed to auction the vehicle and subtract that amount obtained from the amount owed. At oral argument, however, both parties stated that after the briefs were filed, the government returned the Escalade to the insurance company. Because the district court properly looked to the victims' losses and not the speculative amount that might be recovered once the Escalade was auctioned in its analysis, these new facts do not undermine the restitution order. Burks is free to bring a separate action if the government violated its agreement to auction the vehicle and apply the proceeds towards the $50,977 owed by Burks. However, any such agreement is not before this court, and we decline to consider or rule upon it.