# United States Court of Appeals
## For the First Circuit

No. 12-2373

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT A. GEORGE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Thompson, Stahl, and Kayatta,
Circuit Judges.

Robert M. Goldstein for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

July 30, 2014

**THOMPSON, <u>Circuit Judge</u>.**

**Overview**

We write today about the curious case of Robert George, a criminal-lawyer-turned-convict. Our story — which we narrate in the light most favorable to the government, <u>see</u> <u>United States</u> v. <u>Acosta-Colón</u>, 741 F.3d 179, 191 (1st Cir. 2013) — starts in a Massachusetts town, sometime in early 2009. Standing in line to buy coffee at a Dunkin' Donuts, George bumped into ex-con Ronald Dardinski. The two went back a ways. George had represented Dardinski in a couple of criminal proceedings. And Dardinski had wanted George to represent him in another criminal matter too, a larceny scheme where he had "sold" some repossessed cars that were not his to sell, pocketing $750,000 from would-be buyers without giving them the autos. Dardinski had told George "everything" about the repo scam but hired another lawyer instead and eventually did four years in prison after pleading guilty to state-larceny charges. Money has long been a sore spot between the men, with Dardinski convinced that George had overcharged him in the other cases. Indeed, as recorded on tapes from prison, Dardinski had told his girlfriend that if George did not pay up, then "when I get out, I'm going to go smash his head in." Anyway, reunited at Dunkin' Donuts, George asked Dardinski, "Oh, what did you ever do with all that money?" — little did George know about Dardinski's head-smashing threat, apparently. "I still have a bunch of it

hidden," Dardinski said. "Well," George shot back, "I can get rid of it for you." As he was leaving, Dardinski promised to call George once he figured out "what was what."[1] And he later would — but not before telling DEA Special Agent Joseph Tamuleviz about his run-in with George and agreeing to become a paid informant against his erstwhile attorney.[2] Dardinski, by the way, did not pull agent Tamuleviz's name out of a hat — he called him because he had worked as an informant for him before.

Spanning nearly two years, the ensuing investigation involved the usual investigative techniques, like tape-recorded conversations and police surveillance. To give the reader a glimpse of how George's scheme played out, we thumbnail it this way, adding further facts later as we discuss specific issues.

During a follow-up meeting, George told Dardinski that he had a mortgage broker who could clean the repo-scam money (or so a jury under the circumstances could easily conclude). "[I]f this guy isn't alright, you can hold me 100% responsible," Dardinski taped George saying. Dardinski said that he had to hide some "coke" money too. George announced at their next conclave — held in George's Lexus — that the broker had "agreed to do the rest," an apparent allusion to the coke money. And he explained the plot's

---

[1] George argues that Dardinski was lying, but the jury was entitled to believe otherwise. See id.

[2] "DEA" is an acronym for the Drug Enforcement Administration.

particulars: Dardinski would give the broker $100,000, who would then cut him an $80,000 check from East Coast Mortgage's account and pocket the rest as a fee.

Thanks to George, Dardinski eventually hooked up with the broker, Michael Hansen. "How many times do you think you'll need it?" Hansen asked Dardinski when they met in person, referring to his laundry services. "Probably ten," Dardinski said. "That a boy!" an excited Hansen shouted. Two times Dardinski handed Hansen $100,000. And two times Hansen gave Dardinski a check for $80,000 made out to Crane Industries, a fake company set up by the DEA. Agents then contacted Hansen, who agreed to cooperate with the government. George had told Dardinski that he was not getting a cent on the deals. But that was a big lie, George told Hansen. And Hansen ended up paying George $20,000 for helping to make the transactions happen.

While this laundering was going on, George also told Dardinski that he would pay him a fee for client referrals. So Dardinski introduced him to "Angel," a supposed drug-dealing friend of his who was really undercover officer Pedro Nieves. The coke money he had laundered through Hansen had come from drug sales involving this dealer, Dardinski told George. "Angel" later gave George a $25,000 cash retainer. That same day, George deposited $9,000 in cash into an account at a Bank of America branch located in Needham, Massachusetts. Twelve minutes later, he deposited

-4-

$8,000 in cash into that account at a different Bank of America branch located a half mile away. Two weeks later, George gave Dardinski a $2,500 check payable to Crane Industries. Written on the same account into which George had deposited the $17,000, this check represented Dardinski's "cut" of the retainer. The check had "office disposal" on the memo line, even though Dardinski had not done a lick of office-disposal work for George.

All this, and more, led to George's arrest, indictment, and jury conviction for money-laundering conspiracy (count 1),[3] aiding and abetting money laundering (counts 2-3),[4] money laundering (counts 4-6),[5] and structuring financial transactions to avoid reporting them (count 7).[6] Following the verdict, the judge sentenced George to 42 months in prison. The judge also ordered him to forfeit his Lexus.

George now appeals his convictions, his sentence, and the forfeiture judgment, challenging several of the judge's rulings along the way. Though passionately presented, his arguments do not persuade. So at the end of the day, we affirm the judge in all respects.

---

[3] See 18 U.S.C. §§ 1956(h), 1957.

[4] See 18 U.S.C. §§ 2, 1956(a)(3).

[5] See 18 U.S.C. § 1956(a)(3).

[6] See 31 U.S.C. § 5324(a)(1).

**Sufficiency Issues**

George had asked for a judgment of acquittal at the close of all the evidence. The judge orally denied the request without prejudice to his reconsidering the motion after the jury's verdict. George later moved post-verdict for a judgment of acquittal or new trial. But the judge denied that motion in a margin order.

A disappointed George claims the judge got the sufficiency ruling all wrong. As he tells it, the government never proved four things: first, that he and Hansen had conspired to launder illegally-gathered money, as count 1 alleged — i.e., money derived from "specified unlawful activity," to use some legal lingo; second, that he had aided and abetted the Dardinski/Hansen transactions, as counts 2-3 alleged; third, that the specified unlawful activity underlying counts 1-3 was wire fraud; and fourth, that the $2,500 George used to cover his check to Dardinski came from the $25,000 "Angel" had given him, as count 6 alleged. Tackling these preserved claims, we review the evidence (direct and circumstantial) afresh and in a prosecution-friendly light, making all reasonable inferences and credibility choices in the government's favor. See, e.g., Acosta-Colón, 741 F.3d at 190-91. Ultimately, George must show that after viewing the evidence this way, no sensible jury could have convicted him. See id. at 191. And of course, it matters not whether his conduct looks squeaky-clean when seen in splendid isolation — nor need the government's

evidence rule out every hypothesis consistent with his innocence, provided the record supports a guilt-beyond-a-reasonable-doubt finding. See United States v. Polanco, 634 F.3d 39, 45 (1st Cir. 2011). No surprise, then, that "a sufficiency challenge is a tough sell," id. at 45-46, and for reasons described below, we decline to buy what George is selling.

### (1)
### Conspiracy

Kicking things off, George challenges his count-1 conviction under § 1956(h). That section criminalizes conspiracy to commit money laundering in violation of §§ 1956 or 1957. Section 1956(a)(1)(B)(i), in turn, criminalizes the conduct of any person who carries out a financial transaction knowing both that the funds involved arose from "some form of unlawful activity" and that the transaction is "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." And § 1957(a) criminalizes "knowingly" engaging in a monetary transaction in "property of a value greater than $10,000" that is also "derived from specified unlawful activity." For both statutes, "specified unlawful activity" includes wire fraud and felony drug offenses. See §§ 1956(c)(7)(A) (referencing 18 U.S.C. § 1961(1)), 1957(f)(3)(emphasizing that "specified unlawful

-7-

activity" for § 1957 purposes has the meaning given in § 1956).[7] Noting that a conspiracy is an agreement between two or more persons to commit a crime, see United States v. Tum, 707 F.3d 68, 74-75 (1st Cir. 2013) (discussing conspiracy essentials), George wants us to conclude that prosecutors failed to prove that he and Hansen ever agreed to launder money that they believed came from wire fraud or drug trafficking. But this we cannot do. Just consider the following evidence, sketched in the light most pleasing to the government, with all credibility issues resolved in its favor:

George knew every dirty detail behind Dardinski's repo caper, having gotten them straight from Dardinski's mouth when Dardinski was looking for a lawyer to help deal with the fallout from that caper. So a rational jury could easily conclude that when George asked Dardinski what he had done with "all that money" and then said that "I can get rid of it for you," George was referring to the loot Dardinski had made from that illegal activity.

---

[7] George sort of hints that the government had to prove that he knew the exact origin of the laundered funds. But neither statute requires any such thing. See § 1956(c)(1) (declaring that it is enough that one knows that the proceeds came from "some form, though not necessarily which form," of felony under federal or state law); § 1957(c) (providing that one need not know "that the offense from which the criminally derived property was derived" is one of those "specified unlawful activit[ies]" listed in the statutes); see also United States v. Cedeño-Pérez, 579 F.3d 54, 59 (1st Cir. 2009).

On the heels of his "I can get rid of it for you" comment, George told Dardinski — over the course of two different recorded conversations, one of which took place in George's Lexus — that he had a mortgage-broker "guy" who would take Dardinski's "hundred grand" and "cut [Dardinski] a check from his company, East Coast Mortgage, for $80,000." George at one point also said that he would tell the broker — who of course turned out to be Hansen — that "we're all set to go." Based on this evidence, a sensible jury could find that George and Hansen had reached an understanding at some point about how to launder Dardinski's illegally-gained money.

"I gotta hide" some "coke" money too, Dardinski confessed to George during the first of their recorded tête-à-têtes. And George clued him in at their next meeting that the broker had "agreed to do the rest." Dardinski complained that the fee he was about to pay for the laundering was too high. Explaining why the fee was what it was, George said that the broker had said, "'I'm doing a huge favor. . . . I don't even know [Dardinski].'" From this evidence, a levelheaded jury could also deduce that George and Hansen had agreed to launder Dardinski's criminally-acquired funds.

To help the two get together, George gave Dardinski Hansen's cell-phone number. And when Dardinski and Hansen finally met, Dardinski made clear (in yet another recorded meeting) that he had "a ton of money stashed here, there, and everywhere" and

suggested that they do a hundred grand first and more later once they get comfortable with each other.  "Was it worth it?" an interested Hansen asked Dardinski, with the first "it" referring to Dardinski's stint in prison for the larceny crime.  "I did four years," Dardinski replied — to which Hansen said, "Yeah.  Fuck it. It's worth it."  Dardinski twice gave Hansen $100,000 (all DEA-supplied money).  The first time he told Hansen that "we'll do this one and then I'll do a bunch more," adding that he had "all that money from the coke too."  "Alright," said Hansen.  The second time Dardinski warned Hansen not to "ride around with" the money because "[t]here's probably fuckin' coke" on it.  "Oh jeez" was Hansen's response.  And each time Hansen gave Dardinski an $80,000 check payable to Crane Industries, the fictitious DEA-undercover company. And speaking of payouts, George had told Dardinski that he "wasn't making any money" on these deals.  But "[t]hat's something I made up," George admitted to Hansen.  Ultimately, Hansen gave George $20,000, saying "the deal's half," and "I want the slate even." The net effect of all this is that a grounded jury could again infer that George and Hansen had settled on a plan to clean Dardinski's dirty money.

Desperate for a way to show that he never agreed to launder ill-gotten gains, George points to evidence suggesting that Dardinski had "lots and lots" of legitimate money from his repossession business that he wanted to hide from the government.

And he invites us to infer that all his deal discussions with Dardinski focused on money Dardinski had earned honestly and so find that the deal-discussion evidence did not — in his words, with his emphasis — "constitute sufficient evidence . . . that George agreed to launder **criminally**-derived money."  His argument has at least two problems, however.  One, caselaw "compels us to draw all reasonable inferences in the government's favor, not his."  Tum, 707 F.3d at 73.  Two, even if we assume for argument's sake that this is a "plausible theory of innocence," George gains nothing, "because the issue is not whether a jury rationally could have acquitted but whether it rationally could have found guilt beyond a reasonable doubt."  See United States v. Seng Tan, 674 F.3d 103, 107 (1st Cir. 2012).  And again, the recorded conversations — viewed in the proper light — gave the jury plenty of reasons to conclude that the conspirators were laundering Dardinski's dirty money, not simply hiding his clean money.

The bottom line is that this phase of George's sufficiency challenge fails.  So we soldier on.

(2)
Aiding and Abetting

George next complains about the adequacy of the evidence on counts 2 and 3, which charged him with aiding and abetting the two money-laundering deals.  For those not in the know, an aider and abetter is (broadly speaking) someone who knowingly assisted a crime's commission, wanting it to succeed.  See, e.g., United

-11-

<u>States</u> v. <u>Davis</u>, 717 F.3d 28, 33 (1st Cir. 2013); <u>Polanco</u>, 634 F.3d at 44. George stresses that he had told Dardinski before the first transaction that he wanted nothing to do with any deal. And he insists that for long stretches he did nothing to further any deal. So parroting the aiding-and-abetting definition, he contends that the evidence does not adequately show that he "participated in the Hansen/Dardinski transactions, or sought by his actions to make them succeed." Color us unpersuaded.

Eyeing the record from the prosecution's perspective (as we now must), <u>see</u> <u>Polanco</u>, 634 F.3d at 45, we remind the reader that after talking the talk about how he could "get rid of" Dardinski's larceny-related money, George then walked the walk — getting Hansen involved, giving Dardinski Hansen's contact info, explaining to Dardinski how Hansen would clean the cash, <u>etc.</u> Here are snippets from recorded conversations between George and Dardinski to help make our point — separated by asterisks, the first is from a chat that occurred shortly after their coffee-shop run-in and the second is from one that occurred a few weeks after that:

> **DARDINSKI:** You're sure this guy's alright, right?
>
> **GEORGE:** Oh my good God. Well, I'll tell you what — I will tell you what: if this guy isn't alright, you can hold me 100% responsible for anything.
>
> **DARDINSKI:** You know, it's a hundred grand. It's a hundred grand.

**GEORGE:** Well I need to tell ya — you don't have a worry in the world with this guy.

**DARDINSKI:** Alright. And I'm not gonna have to pay no taxes? Nothing — it's never gonna come back to me?

**GEORGE:** Nope. It's his responsibility. What's he [sic] gonna do is give you the check that you need. Now you gotta give me — ah, you know I can't do it — I have to have it. I'll call him up. I'll tell him we're all set to go.

* * *

**GEORGE:** I'll tell you one thing, though. I just talked to the guy a second ago. Umm, he's sitting in his office, and, and if I don't call him — [y]ou know this is the way he's with me now. I don't call him, I don't call him, it's all done. . . .

**DARDINSKI:** Alright. . . .

. . . .


**GEORGE:** You're, you're paying a guy two, you know, you're paying a guy two points on a hundred dol — to, to, cut a, to cut you a check for 80 dol — I'm not doing anything wrong because I'm not benefitting from it.

**DARDINSKI:** Okay.

. . . .

**GEORGE:** Okay, so you're telling me I gotta tell this guy what time?

**DARDINSKI:** I don't know. That's the thing. It's traffic and the weather, and my boss, um —

**GEORGE:** Just so you know about this guy, okay —

-13-

> **DARDINSKI:** I'll call you back and by five o'clock I'll call you.
>
> **GEORGE:** Can I just tell you something about this guy? We don't do this, we're done with him.
>
> **DARDINSKI:** Okay.

Obviously, then, the evidence is quite sufficient to support the aiding-and-abetting convictions.

Scrambling for a way around the problem, George writes that he cannot be an aider and abetter because he "clearly told Dardinski" in a recorded conversation nine days before the first transaction went down that he wanted nothing to do with any deal with Hansen. True, some transcripts of the just-mentioned recorded confab reveal George telling Dardinski that "I'm not involved" and that "you can tell [Hansen] what I said." But other things George said cut the other way — for example, when Dardinski said that Hansen wanted to make the deal's first check out to George, George responded, "You tell him unless he calls and discusses it with me, not to make checks out, not to make any check out to me." A reasonably-minded jury taking the view most helpful to the government could find that a cautious George did not want an $80,000 check made payable to him unless he and Hansen were on the same page. And a logical jury could also conclude that George did not like talking shop over the phone and so sprinkled in words suggesting his unwillingness to do anything illegal just in case

the police were listening in.[8]  We offer this vignette to show how George wanted to avoid like the plague any over-the-phone discussions of what he called "money laundering" deals.  It is a conversation between George and Hansen four months after the second deal (remember, "Ronnie" is Dardinski):

> **GEORGE**:  He says to me, he calls me.  I was just happy you were doing the deal because I said to myself, "that damn fucking Hansen knows I wasn't full of shit and he knows I didn't take the deal somewhere else."
>
> **HANSEN**:  Yeah.
>
> **GEORGE**:  But, he says Hans[e]n wants you, or Hans[e]n asked me to ask you, he will cut the check to you and then you put it in your account, and then you'll cash the check or cut me a check.  <u>In other words, a 'double-mummo', money laundering</u>.  And I said, <u>he said it on the fucking telephone, right</u>?  Now at this point I'm saying, "Should I call Hans[e]n up who won't take my call?  And just tell him not to talk to this guy on the phone; I don't know what's going on here, you know."  And I said[,] "Ronnie, what the fuck would I run a check through my account that I'm not making any money on?"  In other words, that wasn't even the right answer.

---

[8] One could read George's brief as suggesting that he withdrew from any criminal endeavor and thus could not be an aider and abetter.  But to the extent he pushes that claim, he cites no authority that withdrawal is a defense to aiding-and-abetting crimes.  The government, contrastingly, reminds us that this is an open question in our circuit — one on which our sibling circuits "appear to be divided," the government stresses, citing <u>United States</u> v. <u>Burks</u>, 678 F.3d 1190, 1195-96 (10th Cir. 2012) (collecting cases).  Consequently, any argument by George of that sort is waived because it is (at best) only perfunctorily raised in his brief.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Maldonado</u>, 708 F.3d 38, 46 n.7 (1st Cir. 2013); <u>United States</u> v. <u>Sanchez</u>, 354 F.3d 70, 80 n.4 (1st Cir. 2004).

(Emphasis added.)

George also insists that he did not talk to Dardinski in the four months leading up to the first deal, that the only recorded conversations between him and Hansen occurred after both deals had gone down, that there was no evidence that he had done "a single thing to further any transaction" during certain periods, and that some recordings showed he had no idea "the transactions occurred, much less know their structure." But what does him in here is that "a 'culpable aider and abetter need not perform the substantive offense, be present when it is performed, or be aware of the details of its execution.'" Davis, 717 F.3d at 33 (quoting United States v. Garcia-Rosa, 876 F.2d 209, 217 (1st Cir. 1989), vacated on other grounds by Rivera-Feliciano v. United States, 498 U.S. 954 (1990)). So the fact that he did not personally participate in the deals and may not have known every tidbit about them in no way undermines the evidentiary sufficiency of the aider-and-abetter finding (which again required beyond-a-reasonable-doubt proof that he knowingly helped another commit a crime, wanting the venture to pan out).

(3)
Wire Fraud

A moment ago, we said count 1 of the indictment charged George with conspiracy to commit money laundering and counts 2-3 charged him with aiding and abetting money laundering — with the money coming from wire fraud or felony drug crimes. The wire fraud

-16-

arose from Dardinski's repo scam, the government insisted (and insists still). George argues here (as he did below) that "the wires had no role or part" in furthering Dardinski's repo scheme, meaning (at least in his mind) that there was no wire fraud to underpin counts 1-3. But his theory is dead wrong, given the following evidence (again arrayed in the light most flattering to the government):

From 2001 to 2002, Dardinski ran a franchise of American Lenders Service ("American," for short) in Massachusetts. Based in Texas, American is "a repossession clearinghouse," to quote Dardinski's trial testimony. A bank looking to, say, repossess a car would call American, Dardinski explained, and American would then farm the work out to franchisees like him. The way it worked here was American would fax Dardinski a repossession order from its Texas office, and he would repossess the car. Unfortunately, he put some of those cars on a lot and told interested persons that they were for sale. Buyers then handed him cash or wrote him checks for cars they would never get. And these facts helped lead to the state-larceny charges against him.

Turning back to George's argument that the wires did not further Dardinski's repo ruse, our caselaw holds that the wires' use need only be "incident[]" to an essential step in the scheme. See, e.g., United States v. Woodward, 149 F.3d 46, 63 (1st Cir. 1998). And contrary to what George suggests, the evidence

-17-

satisfies that standard because without the info in the faxes —
which are interstate wire communications, to be sure — Dardinski
would have lost part of his supply of decoy cars.  In other words,
the interstate faxes helped advance Dardinski's state-larceny
scheme, even if only in an incidental way.  So this sufficiency
attack, like his first, goes nowhere.

(4)
The $2,500 Check

George also grumbles about the sufficiency of the
evidence on count 6, a money-laundering count under 18 U.S.C.
§ 1956(a)(3)(B) involving the $2,500 "client referral" check that
he gave Dardinski.  But he is all wet on this one too.

First, a quick fact refresher.  After drug-dealer "Angel"
(played by undercover officer Nieves) handed him the $25,000 cash
retainer, George put the dough into his account through two
separate deposits (minutes apart), one for $9,000, the other for
$8,000.  He later wrote Dardinski a $2,500 check from this account
as payment for the referral — penning "office disposal" on the
check's memo line, even though Dardinski had not done a smidgen of
office-disposal work for George.

With all that in mind, George essentially makes the
following four-step argument.  Step one:  Before he made the two
deposits, his account had a $122.82 balance.  That same day, a
$16,557.41 check payable to the Massachusetts Department of Revenue
cleared his account, leaving him a $565.41 balance:  $122.82 (the

previous balance) + $17,000 (the cash deposits) - $16,557.41 (the Department of Revenue check) = $565.41.  Of that amount, only $442.59 came from the two deposits:  $565.41 - $122.82 (the balance before the $17,000 in cash deposits) = $442.59.  Step two: Subsection (a)(3)(B) criminalizes financial transactions involving property "represented to be the proceeds of specified unlawful activity."  Step three:  The word "involving" means that prosecutors had to prove that every penny used to fund the $2,500 check came from the $25,000 cash retainer, which they failed to do, given his account balance.  Step four:  Ergo, we must toss his count-6 conviction.

An interesting theory, but one that cannot survive close inspection.  Consider United States v. McGauley, 279 F.3d 62 (1st Cir. 2002).  There we rejected an argument like the one presented here — in the context of a money-laundering prosecution under § 1956(a)(1), a provision virtually identical to § 1956(a)(3)(B): subsection (a)(1) deals with "property involved in a financial transaction represent[ing] the proceeds from some form of unlawful activity"; subsection (a)(3)(B) deals with "a financial transaction involving property represented to be the proceeds of specified unlawful activity."  (Emphasis added.)  Anyhow, the McGauley defendant deposited $155.76 of illegally-gathered gains into a bank account, later closed that account, divided that account's contents into two $49,497.40 cashier checks, deposited those checks into two

-19-

new accounts at a different bank, and then withdrew large sums of money from those accounts. 279 F.3d at 70-71. Fighting her money-laundering conviction on appeal, she insisted that prosecutors had to — but did not — prove that the full amount of the two $49,497.40 checks came from an illegal source. Id. at 71. Nonsense, we ruled. See id. To accept that argument would "eviscerate" § 1956, we said, "permitting one to avoid its reach simply by commingling proceeds of unlawful activity with legitimate funds." Id. And she did not provide any cases to back up her suggestion "that there is a de minimis exception to § 1956 that removes from the money laundering prohibition transactions in which legitimate funds greatly outweigh illegitimate ones." Id. We see no meaningful difference between the McGauley defendant's argument and George's. And applying McGauley's teachings to this case — which makes sense, given the subsections' similar wording — kiboshes George's last sufficiency challenge.[9]

---

[9] Somewhat relatedly, George argues that, at a minimum, we must order a new trial because the judge should have told the jury that prosecutors "needed to prove that the money used to fund the $2,500 check derived from the funds represented to be drug proceeds by the undercover agent." But he floats that idea in a single, unsupported sentence: he offers no case analysis, for example, and never explains why the judge's actual instruction — that the government had to prove, among other things, "that the transaction involved property represented by a law enforcement officer and believed by the defendant to be the proceeds of unlawful activity" — did not do the job. Needless to say, the argument is waived. See, e.g., Maldonado, 708 F.3d at 46 n.7; Sanchez, 354 F.3d at 80 n.4.

**Evidentiary Issues**

Next, George claims that the judge committed evidentiary error by (1) admitting Hansen's statements under the coconspirator exception to the hearsay rule; (2) not striking agent Tamuleviz's testimony about a check from Hansen made out to George's law office; (3) excluding Hansen's plea colloquy and cooperation agreement; (4) admitting certain recorded conversations involving "Angel"; and (5) letting Dardinski and agent Tamuleviz explain what they thought George meant when George said during the meeting in the Lexus that "he's already agreed to do the rest."  None of his gripes requires us to reverse, however.

(1)
Hansen's Statements

George's lead argument is that the judge bungled matters by admitting Hansen's recorded statements as non-hearsay statements of a coconspirator.[10]  See Fed. R. Evid. 801(d)(2)(E).  That exception applies if the judge finds it is more likely than not that the defendant was a coconspirator of the speaker, that the conspiracy existed at the time the statements were made, and that they were made in furtherance of the conspiracy.  See, e.g., United

_____

[10] The groused-about statements include Hansen's (a) asking Dardinski how many times he would need his laundry services and whether doing time on the state-larceny charge was worth it; (b) responding "alright" to Dardinski's saying that "I'll do a bunch more" deals and "I got all that money from the coke too"; and (c) saying "oh jeez" when Dardinski warned him that "there's probably fuckin' coke from this guy on it."

-21-

States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). How this works is that a judge conditionally admits the alleged coconspirator statements, "subject to a later finding by the [judge], supported by extrinsic evidence (other than the statements themselves)," sufficient to show the conspiracy and the speaker's involvement in it. United States v. Sepúlveda-Hernández, 752 F.3d 22, 30 n.2 (1st Cir. 2014). The judge here followed that model. But an unhappy George protests that he had quit the conspiracy before the complained-about recordings were made and so nothing Hansen said qualified as coconspirator statements made in furtherance of the conspiracy. If properly preserved, that issue gets clear-error review; if unpreserved, it gets plain-error review. See United States v. Mehanna, 735 F.3d 32, 56-57 (1st Cir. 2013). The parties spar over whether George did enough to preserve the issue. But we need not say who is right, because even giving him the benefit of the doubt on the preservation point, George's withdrawal theory is not a winner.

Withdrawal is a difficult defense, typically requiring evidence that the accused confessed his involvement in the conspiracy to the government or announced his withdrawal to his coconspirators. See, e.g., id. at 57; United States v. Ciresi, 697 F.3d 19, 27 (1st Cir. 2012); United States v. Potter, 463 F.3d 9, 20 (1st Cir. 2006). George did neither, though he thinks he did broadcast his withdrawal — twice.

-22-

The first time, he says, happened during the meeting in his Lexus with Dardinski, before Dardinski had even met Hansen. There, George reminds us, he told Dardinski, if "I don't" phone "the guy" then "it's all done."  That, obviously, was not a confession to the authorities.  George does not argue otherwise. But neither does he explain how these statements — which could suggest that he was champing at the bit to get a deal done — constituted a clear communication to coconspirator Hansen that he was withdrawing.  And far from disavowing the conspiracy, George spent a lot of time at that meeting walking Dardinski through how the deals would work.  He also later gave him Hansen's cell-phone number.  All of that devastates this line of argument.

Which takes us to the second time George supposedly withdrew.  As we noted earlier (in rejecting sufficiency challenge number 2), George repeatedly told Dardinski days before the first deal that "I'm not involved" and that "you can tell [Hansen] what I said."  With that he became an ex-coconspirator.  Or so he argues.  But other things he said during that same conversation pour cold water on this theory.  One example that springs immediately to mind is his telling Dardinski to tell Hansen that "unless he calls and discusses it with me, not to make checks out . . . to me."  And do not forget that he later accepted $20,000 from Hansen for his role in the money-laundering scheme — a cash grab that showed that he had been part of the conspiracy all along.

Ever persistent, George points to periods before and after the deals where he "largely" would not answer or return Dardinski's calls.  "Largely" is his word, not ours.  And, he writes, his not "speak[ing] to or engag[ing] Dardinski" proves that he had quit the conspiracy.  But mere cessation of activity on behalf of the conspiracy is not enough to show withdrawal.  See United States v. Piper, 298 F.3d 47, 53 (1st Cir. 2002); see also Mehanna, 735 F.3d at 57 (holding that "[a]voiding contact with one's coconspirators, without more, is not in any way, shape, or form tantamount to abandoning the conspiracy").  And skipping meetings and refusing to answer calls from cooperating witnesses and coconspirators "constitute inaction rather than affirmative steps to distance himself from his prior involvement."  United States v. Guevara, 706 F.3d 38, 46 n.9 (1st Cir. 2013).  So this leg of his argument does not support his position either.

The short of it is that the judge did not clearly err in admitting Hansens's statements made after George's alleged withdrawal.  Enough said about that.

(2)
Agent Tamuleviz's Check-Related Testimony

During the trial, prosecutors showed agent Tamuleviz what was supposedly an $80,000 check from Hansen to George's law office. The date on it suggested that someone had written it while the conspiracy was going on.  The defense objected.  Agent Tamuleviz only knew about the check — what it was, where it came from, etc.

-24-

— as a result of debriefing Hansen <u>after</u> the conspiracy, George's lawyer argued.  What prosecutors are trying to do, he added, is to get "Hansen's declaration" — that he had penned the check during the conspiracy — in "through Tamuleviz for the truth of the matter asserted, but they're not calling Michael Hansen, so it's hearsay." Objection overruled, the judge said.  Agent Tamuleviz then identified the check and confirmed that he had gotten it from Hansen.  The defense energetically cross-questioned the agent, getting him to agree that Hansen had handed him the check after turning on George and that George had neither signed nor cashed the check.

That night, the defense filed a written motion to strike the check and related testimony, arguing that their admission was improper hearsay that violated George's confrontation rights under <u>Crawford</u> v. <u>Washington</u>, 541 U.S. 36 (2004).[11]  The government opposed.  But the judge was partially receptive to George's argument, ultimately ruling that he would strike the check from the evidence, but not agent Tamuleviz's related testimony.  And the judge later told the jury that he had struck the check "from the record," adding that "evidence that the [c]ourt orders stricken is

_____

[11] Oversimplifying a bit for present purposes, <u>Crawford</u> holds that the Constitution's confrontation clause bars the admission of "testimonial" evidence unless the witness is unavailable and the defendant has had a previous opportunity for cross-examination. <u>Id.</u> at 53–54.

-25-

no longer evidence in the case and must not be considered by you once you commence your deliberations."

Still smarting from the judge's ruling, George argues that the admission of agent Tamuleviz's check-related testimony offended his confrontation rights under Crawford. But we need not debate whether he is right, because even if an error occurred (something we do not decide), that error was harmless beyond a reasonable doubt. See United States v. Earle, 488 F.3d 537, 542 (1st Cir. 2007) (stressing that "[i]f a constitutional error has occurred, we must order a new trial unless the government has shown that any error was 'harmless' beyond a reasonable doubt"). We explain.

Harmlessness turns on things like the importance of the testimony to the case, the cumulativeness of the testimony, the presence or absence of other evidence corroborating or contradicting the testimony, the extent of permitted cross-examination, and the overall strength of the government's case. Id. at 546. Here agent Tamuleviz's check testimony concerned a peripheral issue and was cumulative of other evidence that came out at trial — the jury, remember, heard others say how Hansen had suggested that he cut George a check, and that George then use the funds derived from that check to cut Dardinski a check. Plus the judge had instructed the jury not to consider the check for any purpose. And we have no reason to think that the jury failed to

follow the judge's command.  See generally Acosta-Colón, 741 F.3d at 202 n.13 (noting that "[w]e presume that juries follow instructions").  Also, defense counsel scored some points on cross-examination, getting agent Tamuleviz to confirm that Hansen had coughed up the check after flipping on George and that George had neither signed nor negotiated the check.  Last — but by no means least — even without the offending testimony, the damning evidence highlighted above underscores how strong the government's case against George was.  So taking everything into account, any error (if there was one) in admitting agent Tamuleviz's check-related testimony was harmless.

(3)
Hansen's Plea Colloquy and Cooperation Agreement

George slams the judge for not admitting Hansen's plea colloquy and cooperation agreement into evidence.  By way of background, George tells us that Hansen pled guilty to failing to file an IRS form required for cash transactions exceeding $10,000.  Hansen never pled guilty to conspiracy or aiding and abetting, George adds, and the government's version of the facts at Hansen's plea colloquy never mentioned any Hansen/George agreement to launder criminally-derived money either.  To George's way of thinking, these documents were admissible as non-hearsay admissions by the government (a party-opponent, George implies) that Hansen was not guilty of conspiracy or aiding and abetting.  See Fed. R. Evid. 801(d)(2) (explaining that admissions by a party-opponent are

not hearsay). And if Hansen was not guilty, then neither is George. Or so George suggests. The judge deemed the documents irrelevant to the crimes charged against George and thought they would only confuse the jury.

Even assuming for argument's sake that the contested papers qualified as non-hearsay under Rule 801(d)(2) — and we intimate no view on the question — the judge's ruling was within the proper exercise of his discretion. See, e.g., Polanco, 634 F.3d at 44 (explaining that abuse-of-discretion review applies in situations like this). Had the judge admitted the documents, a prosecutor probably would have taken the stand to explain the government's reasons for plea bargaining with Hansen — reasons that may have had nothing to do with his guilt, like getting him to cooperate against George, for instance. And the reasons given could have been highly incriminating to George. Also, the judge could have ended up with a mini-trial about a side issue — Hansen's innocence of charges not made — that might have confused the jury. Given all this, the judge abused no discretion in keeping the disputed documents out. See, e.g., United States v. Bingham, 653 F.3d 983, 999 (9th Cir. 2011) (collecting cases holding that a judge may exclude documents like these on Fed. R. Evid. 403 grounds).

Hoping against hope, George argues that the judge's decision impaired his right to present a complete defense. But his

fair-trial rights were violated only if the judge abused his discretion in barring the evidence.  See, e.g., United States v. Brandon, 17 F.3d 409, 424 n.10, 444 (1st Cir. 1994).  And as we have concluded, the judge did not.  Consequently, this argument is a no-go.

(4)
"Angel" Conversations

Over defense objections, the judge admitted into evidence — with redactions — recordings of conversations involving George, Dardinski, and "Angel," the supposed drug dealer looking to hire George who was really undercover officer Nieves.  George is okay with the parts that touched on whether "Angel" paid his $25,000 retainer with dirty money.  His beef is with the other parts that, he says, "smeared" him as "unprofessional" — stuff he considers inadmissible as forbidden character evidence that was more prejudicial than probative.  See Fed. R. Evid. 404(b), 403.  His opening example involves a snippet of conversation discussing bail jumping.  "[A]ll he" — referring to "Angel" — "cares about" is getting his guys "out" on bail, Dardinski explained.  "I've done it a million times," George shot back.  "Because if they're in, there's more of a chance that they're gonna roll," Dardinski said, adding that "[i]f they're out, they go home. He pays them."  "What kind of money are we looking at right now?" George asked.  "Big money," Dardinski replied.  "I'm making a lot here," Dardinski stressed, after having earlier told George that he had gotten his

-29-

money "from this coke guy." "So," George said, "he's just got money, money, money." Reviewing solely for abuse of discretion, see, e.g., United States v. Doe, 741 F.3d 217, 229 (1st Cir. 2013), we see no reason to reverse the judge's action.

Evidence of a defendant's other bad acts is not admissible to prove his propensity to behave in a particular way. See Fed. R. Evid. 404(b)(1). But bad-acts evidence may be admitted for other purposes. See id. 404(b)(2). And the recordings served an important non-propensity purpose: they helped paint a picture of George and "Angel's" relationship, bringing into bold relief George's understanding that "Angel" had made his money in the drug trade. See Doe, 741 F.3d at 230 (finding no abuse of discretion in admitting evidence of defendant's past drug dealings because "it painted a picture of the relationship between" the defendant and the undercover officer, "thereby providing the jury with context surrounding the drug sale").

Of course, even if admissible under Rule 404(b), bad-acts evidence may stay out under Rule 403 if it is "substantially" more prejudicial than probative. See, e.g., United States v. Sebaggala, 256 F.3d 59, 67 (1st Cir. 2001). Such an inquiry — involving the balancing of intangibles — calls on the judge to exercise judgment, naturally. See, e.g., United States v. Williams, 717 F.3d 35, 41 (1st Cir. 2013). And the judge was equal to the task, concluding that the balance favored admitting some parts of the recordings but

excluding others.  As a further safeguard, the judge told counsel that he would consider any limiting instruction offered by the defense, and later gave George's requested instruction, telling the jury that "Mr. George did not engage in any unlawful behavior by simply accepting the undercover agent as a new client or by accepting the $25,000 in cash as a legal fee."  Only in extreme cases will we second-guess the judge's "on-the-spot judgment." Id. This is not that case.

(5)
### Dardinski's and Agent Tamuleviz's Testimony Concerning George's "agreed to do the rest" Comment

And that leaves one remaining evidentiary issue.  Over defense objections, the judge let Dardinski explain what he thought George meant when George said during the meeting in the Lexus that "he's already agreed to do the rest":  Dardinski understood that statement to mean that George and the mortgage broker (who later turned out to be Hansen) "had discussed the proceeds from the drug money and all that, and that's where all the money was coming from."  Also over defense objections, the judge let agent Tamuleviz explain what he thought George's "he's already agreed to do the rest" statement meant:  "The rest of the money at that time," agent Tamuleviz testified, "would be from the money Mr. Dardinski made from the repossession and also from the cocaine."  George argues that the judge's rulings violated Fed. R. Evid. 701 — a rule that allows a lay witness to offer an opinion if it is rationally

-31-

premised on his perception, helps the jury better understand either his testimony or some fact in issue, and is not based on scientific or specialized knowledge within the scope of Rule 702 (governing expert opinion). We review for abuse of discretion, see United States v. Muñoz-Franco, 487 F.3d 25, 36 (1st Cir. 2007), and find none.

As for Dardinski, he was personally involved in this conversation with George, clearly. And he based his lay conclusion not on scientific-like knowledge but on an earlier chat he had had with George — you know, the one where he told George that he had "coke" money to launder. Also, the judge could reasonably conclude that this testimony would help the jury. See United States v. Lizardo, 445 F.3d 73, 83 (1st Cir. 2006) (finding no abuse of discretion in allowing a co-defendant to testify about the meaning of statements that "were either deliberately ambiguous or of uncertain meaning").

And as for agent Tamuleviz, he had been intimately involved in the investigation from start to finish, setting Dardinski up with recording equipment, surveilling every Dardinski/George meeting, reviewing every recording, etc. So he knew that Dardinski had told George that he had "coke" money in need of cleaning (on top of the money from the repo scam) before George reported back at their next meeting that his "guy" had "agreed to do the rest." Time and again we have stated that Rule

701 lets in "'testimony based on the lay expertise a witness personally acquires through experience, often on the job.'" United States v. Santiago, 560 F.3d 62, 66 (1st Cir. 2009) (quoting United States v. Maher, 454 F.3d 13, 24 (1st Cir. 2006)). Exactly so here. And given these circumstances we spot no abuse of discretion in the judge's course of action. See United States v. Albertelli, 687 F.3d 439, 447 (1st Cir. 2012) (okaying the admission of an agent's testimony about the meaning of recorded conversations, because "while not the most traditional lay opinion," the agent's "testimony formally meets the requirements of Rule 701, being rationally based on [his] perception of the conversations; helpful in the Rule 701 sense broadly understood; and yet not based on expert knowledge within the meaning of Rule 702") (internal quotation marks and citation omitted), cert. denied 133 S. Ct. 2389 (2013).

With that and at long last, we have exhausted George's evidentiary challenges. But there is still some work to do.

## New-Trial Issue

Alleging, as he did below, that the interests of justice call for a new trial, George separately argues that the judge abused his discretion in denying his new-trial motion. But George's new-trial argument simply replays the arguments that we just outright rejected. Consequently, we see no hint of abused discretion here. See Maldonado, 708 F.3d at 46.

-33-

## Cumulative-Error Issue

George invokes the cumulative-error doctrine in the hopes of landing a new trial. We have spied <u>one</u> assumed error (concerning agent Tamuleviz's check-related testimony) that was harmless to boot. Consequently, the cumulative-error doctrine helps him not at all. <u>See</u> <u>United States</u> v. <u>DeSimone</u>, 699 F.3d 113, 128 (1st Cir. 2012) (holding that "[t]he cumulative error doctrine is of no use to [the defendant] because the only identified error was harmless").

## Sentencing-Enhancement Issue

When calculating George's sentence the judge imposed a six-level enhancement under § 2S1.1(b)(1)(B)(I) of the federal sentencing guidelines.[12] That section requires the enhancement if "the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote[,] . . . an offense involving the manufacture, importation, or distribution of a controlled substance or a listed chemical." George questions the factual basis for the enhancement, claiming that prosecutors never proved that he knew or believed that any of the laundered money was drug money. Precisely the opposite is true, however. Don't forget: prosecutors played a recording of Dardinski telling George

---

[12] The judge cited USSG § 2S1.1(b)(1)(A) in applying the enhancer. But § 2S1.1(b)(1)(B)(i) is the right provision, <u>see</u> <u>United States</u> v. <u>Dávila-González</u>, 595 F.3d 42, 45-46 (1st Cir. 2010), so that is the one we use.

that he had to "hide" some "coke" money and another recording of George telling Dardinski that Hansen had agreed to clean "the rest," with "the rest" being an apparent allusion to the drug money. So we spy no reversible error with the judge's enhancement ruling. See United States v. Matthews, 749 F.3d 99, 105 (1st Cir. 2014) (explaining that when it comes to enhancement decisions, "we review the district court's legal rulings anew, its factfinding for clear error, and its application of the guidelines to the case on a 'sliding scale' — with the scrutiny cranked up the more law-driven the court's decision is" (quoting United States v. Zehrung, 714 F.3d 628, 631 (1st Cir. 2013))).

Not so fast, George argues. The judge found the sentencing-enhancement facts by a preponderance of the evidence, not a jury using a beyond-a-reasonable-doubt standard, which he argues violates Apprendi v. New Jersey, 530 U.S. 466 (2000), and Alleyne v. United States, 133 S. Ct. 2151 (2013). But because the enhancement did not increase a statutory maximum or minimum sentence, the judge did nothing wrong here. See United States v. Ramírez-Negrón, 751 F.3d 42, 48 (1st Cir. 2014).

As a fallback, George argues that the judge should have applied a clear-and-convincing standard of proof. Our caselaw clearly holds that the preponderance standard applies in circumstances like this case. See, e.g., id. So George strikes out on this theory too.

## Forfeiture Issue

Lastly, George criticizes the district judge for ordering his Lexus forfeited. That order relied on two statutes. The first one, 18 U.S.C. § 982(a)(1), provides that anyone found guilty of infracting § 1957 — criminalizing the moving around of at least $10,000 in illegal proceeds through a financial institution — shall forfeit any property "involved in" or "traceable to" the crime. The second one, 31 U.S.C. § 5317(c)(1)(A), declares that anyone found guilty of violating § 5324 — criminalizing the structuring of cash transactions to evade reporting requirements — shall forfeit any property "involved in" or "traceable" to the offense. George's theory is that prosecutors failed to establish a "substantial connection" between the car and the crimes. In assessing this argument, we give fresh review to legal questions and clear-error review to mixed questions of law and fact. See, e.g., United States v. Reiner, 500 F.3d 10, 18 (1st Cir. 2007). So viewed, George's claim is a nonstarter.

Cases discussing a civil-forfeiture statute, 21 U.S.C. § 881(a)(7), say that a "substantial connection" is required between the property to be forfeited and the criminal activity. See United States v. Heldeman, 402 F.3d 220, 222 (1st Cir. 2005). George apparently believes that the "substantial connection" standard should apply in the criminal-forfeiture context too, a matter expressly left open in Heldeman. See id. Today is not the

day to decide the issue, however.  That is because "[w]hatever the exact degree of connection required by the criminal forfeiture statute," the evidence sufficed to support the forfeiture.  <u>See</u> <u>id.</u> Recall how George met with Dardinski in the Lexus — a pivotal meeting where George explained the ins and outs of the money-laundering deal, which his "guy" (Hansen) had agreed to help with. That the meeting happened in George's Lexus rather than at his law office or some other public place suggests that he wanted to protect the crooked scheme from prying eyes and ears.  We detect no reversible error.

## Final Words

Our work over, we affirm George's convictions, his sentence, and the forfeiture order entered against him.

<u>So ordered</u>.